**ENVIRONMENTAL DEFENSE FUND, INC., the Ozark Society, Arkansas Audubon Society, Inc., Arkansas Ecology Center, Pratt Remmel, Jr., and Russell Harper**

v.

**CORPS OF ENGINEERS OF the UNITED STATES ARMY, Stanley R. Resor, Secretary of the Army, and General Frederick B. Clarke, Chief of Engineers, Corps of Engineers of the United States Army.**

No. LR-70-C-203.

United States District Court, E. D. Arkansas, W. D.

Feb. 19, 1971.

See also D.C., 325 F.Supp. 728.

Richard S. Arnold, Texarkana, Ark., Edward Lee Rogers, Stony Brook, N. Y., for plaintiff.

W. H. Dillahunty, U. S. Atty., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION NUMBER FIVE

EISELE, District Judge.

This case was tried to the Court on its merits on February 8, 9 and 10, 1971. At the conclusion of the trial, the case was argued orally by the attorneys. The parties were then given until February 16, 1971, within which to submit proposed findings of fact and conclusions of law. Upon receipt thereof the case was taken under submission by the Court. This opinion will constitute the Court's fifth and final memorandum in this case.

In its letter memorandum of December 22, 1970, the Court stated:

"The Court has concluded that there is a substantial controversy between the parties and, further that at least in one respect (see *infra*) there is a reasonable probability that the plaintiffs will succeed after final hearing upon the merits, unless, prior thereto, the defendants voluntarily take certain administrative action as discussed below.

\*　\*　\*　\*　\*　\*

"The Court wishes to make clear, initially, that the pendency of this action should not be considered, in any way, as limiting the authority of the defendants to proceed administratively in order to fully comply with any requirement of law.

"As the Court views this case, the ultimate decisions must be made not by the judiciary but by the executive and legislative branches of our government. This Court does not intend to substitute its judgment as to what would be the best use of the Cossatot River and its environs for that of the Congress or those administrative departments of the executive branch which are charged by the Congress with the duty of carrying out its mandate. The role of the Court is simply to require compliance with the laws

enacted by the United States Congress."

Later in that opinion the Court stated:

"The only 'cause of action' with respect to which the Court believes that the plaintiffs will probably prevail at the hearing upon the merits (unless the defendants prior thereto take certain administrative action) is that characterized as the 'First Cause of Action' in the complaint—that is, the claim arising under, and by virtue of, the National Environmental Policy Act of 1969, 42 U.S.C. § 4331 et seq."

On January 21, 1971, the Court filed its "Memorandum Opinion Number Four," which dealt specifically with plaintiffs' "First Cause of Action," which is based upon the National Environmental Policy Act of 1969, 42 U.S.C. § 4331 et seq., (hereinafter referred to as NEPA). At page 9 of that opinion the Court stated that the testimony "left the general impression with the Court that, if no work had been done on the Gillham Dam project, the defendants would be approaching the environmental impact study with a different, more open-minded, attitude." This determination was reinforced and documented by the testimony introduced at the trial on the merits.

Much weight was given by the defendants, both at the original hearing and at the trial on the merits, to the fact that the project was approximately two-thirds completed. In commenting on this point the Court stated in its Memorandum Opinion Number Four:

"The Court is not suggesting that the status of the work should not be considered in determining whether to proceed with the project. It is suggesting that the degree of the completion of the work should not inhibit the objective and thorough evaluation of the environmental impact of the project as required by NEPA. Although the attitude of the defendants is understandable, nevertheless, as the Court interprets NEPA, the Congress of the United States is intent upon requiring the agencies of the United States government, such as the defendants here, to objectively evaluate all of their projects, regardless of how much money has already been spent thereon and regardless of the degree of completion of the work."

Later in that memorandum, the Court analyzed the "Environmental Statement" (Plaintiffs' Exhibit 7) and pointed out the various environmental "impacts" suggested by the plaintiffs which had not been evaluated by the defendants or described adequately in the impact statement. The Court concluded:

"In other words, plaintiffs contend that the impact statement simply does not set forth a detailed study and examination of the important environmental factors involved. On the basis of the record and the evidence presented at the preliminary hearing, the Court is inclined to agree. It recognizes, of course, that much investigation and analysis may have been made and considered by the defendants even though not reflected in the impact statement or brought out by defendants' witnesses.

"The factual findings referred to above are, as indicated, based upon the evidence introduced at the first hearing. Those findings, of course, could possibly be changed by other evidence which might be introduced at the hearing on the merits. Furthermore, because of the Court's view of its limited role under the law, as set forth in its third memorandum, none of such findings is in any way binding upon the defendants, or other appropriate administrative agencies, in the making of their own determinations with respect to such factual issues. Ultimately this Court could upset such administrative determinations only if they were not made in the manner required by law or if they were arbitrary and capricious under constitutional standards.

"The Court wishes to emphasize that its findings are not in any way conclusive upon the factual issues referred

to. Those findings, based upon the record and the evidence introduced at the preliminary hearing, are intended to indicate those areas wherein the defendants may not have adequately complied with the provisions, policies and objectives of NEPA. They should assist counsel in determining the proof that they may wish to make at the hearing on the merits. In addition, they may assist the defendants in any further administrative studies, investigations, or hearings which they may voluntarily undertake to determine, and record, the environmental impact of the Gillham Dam and reservoir project. Indeed, the defendants may already have made studies, investigations and analyses which would answer the Court's doubts as to their compliance with NEPA. On the other hand, they may wish to undertake, prior to the hearing on the merits, additional studies or hearings in order to demonstrate that they have taken into consideration all significant ecological and environmental data related to this project, as required by law."

No "additional studies or hearings" were undertaken by defendants between the conclusion of the November hearing and the February hearing upon the merits.

On January 21, 1971, the plaintiffs filed a "Motion for Leave to File First Amendment to Complaint." On February 2, 1971, this motion was granted. The amendment set forth the plaintiffs' "Tenth Cause of Action" and "Eleventh Cause of Action." The latter is germane here because it makes explicit the contentions of plaintiffs with respect to the environmental impact statement filed by the defendants on October 5, 1970, after the commencement of the suit. The plaintiffs contend that said statement was not in fact a "detailed statement" within the meaning of § 102 of NEPA, did not adequately and properly cover the subjects required by the statute, and did not substantially comply with the "Interim Guidelines" issued by the Council on Environmental Quality.

Although a "new" impact statement was filed by the defendants on January 22, 1971, (Defendants' Exhibit 12), the Court has concluded that the latter is essentially the same as the one filed in October, 1970. Both fall far short of the requirements of the law. The "new" statement does not even treat of problems brought out by the testimony in the November hearing. See discussion below.

Upon the basis of the evidence and the law, the Court now concludes that the plaintiffs are entitled to an order enjoining the defendants from continuing with the Gillham Dam project and, more particularly, with the construction of the embankment across the Cossatot River, *unless and until they comply with the provisions of NEPA.* A final order is being entered accordingly.

The Court here adopts by reference all findings of fact and conclusions of law contained in each of its prior memoranda, excepting only as same may be inconsistent with, or changed or modified by, the findings and conclusions set forth below.

Before discussing plaintiffs' "First Cause of Action" and "Eleventh Cause of Action," the Court wishes to make explicit its rulings on all other matters.

The Court is of the opinion that the plaintiffs' second, third, and tenth causes of action should be dismissed. This determination means that, of the plaintiffs' eleven asserted "causes of action," the Court is entering its order dismissing all but the first and the eleventh.

In its third memorandum, dated December 22, 1970, the Court indicated its intention to dismiss plaintiffs' fourth, fifth, sixth, seventh, eighth and ninth causes of action. In that opinion it tentatively left open the issues raised by plaintiffs' second and third causes of action. With respect to these causes of action the Court there stated:

"The Court should point out, however, that the plaintiffs also made a substantial showing at the November 24–25 hearing with respect to the alleged

non-compliance of the defendants with the provisions of section 2(b) of the Fish & Wildlife Coordination Act of 1934, 16 U.S.C. § 662(b).

"However, for many reasons, the Court is doubtful that such non-compliance, if any, could form a legal basis upon which plaintiffs could obtain relief here. Furthermore, it is unreasonable to require defendants to go back through the processes required by section 2(b) of the Fish and Wildlife Act of 1934 at this time (some 13 years after the fact) and, particularly so, if the Court reads the NEPA of 1969 correctly. It is the Court's view that, if defendants comply with the provisions of the latter Act in good faith, they will automatically take into consideration all of the factors required by the Fish and Wildlife Act and it is not reasonable to require them to do both separately. Certainly it would take a much stronger showing at the hearing upon the merits to convince the Court to the contrary.

"The same may be said with regard to the plaintiffs' 'Third Cause of Action' predicated upon 33 U.S.C. § 540, which requires that 'federal improvements of rivers * * * shall include a due regard for wildlife conservation.' Indeed, plaintiffs allege in paragraph 47 of their complaint that 'this requirement of "due regard for wildlife conservation" is one of the national policies underlying NEPA and the Environmental Protection Act of 1970.' "
The Court is now more convinced than ever that the doubts it expressed with respect to plaintiffs' second and third causes of action were well founded. It has concluded that the facts alleged would not independently form the basis for granting the plaintiffs the relief they seek, to-wit, an injunction prohibiting further work on the Gillham project. However, as the Court interprets NEPA, the defendants' failure to comply with the requirements of the Fish and Wildlife Coordination Act of 1934, or with the Act of June 20, 1938, 33 U.S.C. § 540, would be matters that the plaintiffs could properly attempt to prove under the allegations set forth in their first and eleventh causes of action, since departures from the congressional policies set forth in those acts, if there were any such departures, should be acknowledged in any "detailed statement" required by § 102 of NEPA. The Court, therefore, while dismissing the second and third causes of action for failing to state claims upon which relief can be granted, wishes to make it clear that such action does not mean that the facts alleged in those causes of action would be irrelevant to the plaintiffs' claims as set forth in their first and eleventh causes of action. This view was suggested in the Court's Third Memorandum when it stated:

"Because of the Court's interpretation of the NEPA of 1969, much of the evidence which the plaintiffs might have introduced with respect to the dismissed causes of action would obviously be relevant to the issues raised in plaintiffs' 'First Cause of Action.' "

■ Plaintiffs' "Tenth Cause of Action" is based upon the contention that the defendants, in the construction of the Gillham Dam, are proceeding in excess of, and in violation of, their purported authority. The dam was authorized by the Act of July 3, 1958, 72 Stat. 297, Public Law 85–500. That law provides that the Gillham Dam project is authorized substantially in accordance with the recommendations of the Chief of Engineers in House Document 170, 85th Congress, 1st Session. Plaintiffs contend that defendants are exceeding their authority, since the proportion of benefits now claimed for "water supply" is substantially less than that specified in House Document 170, and, further, that the defendants are now purporting to justify the project by reference to purposes not mentioned in House Document 170, including "water quality control," "fish and wildlife," and "redevelopment."

It is the Court's opinion that it is the sole prerogative of the Congress of the

United States to determine if the project is proceeding in accordance with its authorization, and, if not, to determine what, if anything, it wishes to do about it. The Congress has the means to bring such matters to its attention and the power, through appropriations and otherwise, to deal with such problems as it deems fit. The Court is therefore dismissing plaintiffs' "Tenth Cause of Action" for failing to state a claim upon which relief can be granted.

This brings us to the heart of the case which involves the interpretation and application of NEPA.

■ Plaintiffs contend that NEPA creates some "substantive" rights in addition to its procedural requirements. They base this contention on the language contained in § 101 of the Act. Although the Court may be oversimplifying their position in this respect, essentially they claim that the Act creates rights in the plaintiffs and others to "safe, healthful, productive, and esthetically and culturally pleasing surroundings;" and to "an environment which supports diversity and variety of individual choice," and "the widest range of beneficial values." See § 101(b). The Court disagrees.

Section 101(a) takes note of the environmental problems facing the nation and then declares it to be the policy of the federal government to use all practical means "to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." In order to carry out this policy, § 101(b) declares it to be the "continuing responsibility of the Federal Government to use all practicable means * * * to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—" attain certain stated objectives, including those, quoted above, which plaintiffs contend create substantive rights.

The Act appears to reflect a compromise which, in the opinion of the Court, falls short of creating the type of "substantive rights" claimed by the plaintiffs. Apparently the sponsors could obtain agreement only upon an Act which declared the national environmental policy. This represents a giant step, but just a step. It is true that the Act required the government "to improve and coordinate Federal plans, functions, programs, and resources," but it does not purport to vest in the plaintiffs, or anyone else, a "right" to the type of environment envisioned therein.

In the instant case it is clear that the damming of the Cossatot will reduce "diversity and variety of individual choice." It is apparently plaintiffs' view that upon the basis of such a finding the Court would have the power, and duty, ultimately and finally to prohibit the construction of the dam across the Cossatot. No reasonable interpretation of the Act would permit this conclusion. If the Congress had intended to leave it to the courts to determine such matters; if, indeed, it had intended to give up its own prerogatives and those of the executive agencies in this respect, it certainly would have used explicit language to accomplish such a far-reaching objective. In view of this interpretation of NEPA by the Court, the plaintiffs are relegated to the "procedural" requirements of the Act.

Section 102, in pertinent part, provides:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

"(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and

in decisionmaking which may have an impact on man's environment;

"(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5 [United States Code], and shall accompany the proposal through the existing agency review processes;

"(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

■ The defendants practically concede that, if we were dealing here with a new project, they would not be in compliance with NEPA, or with the Interim Guidelines issued by the Council on Environmental Quality, 35 Fed.Reg. 7390, or with their own regulations, such as that contained in Plaintiffs' Exhibit 31, which is designated "E.C. 1120–2–56," issued September 25, 1970. But they strongly suggest that NEPA permits a "double standard" with respect to ongoing projects (such as the Gillham Dam project) which were well under way at the time of the passage of NEPA. The Court does not fully agree, or fully disagree, with this contention. To again quote from the Court's fourth memorandum:

"The Court is not suggesting that the status of the work should not be considered in determining whether to proceed with the project. It is suggesting that the degree of the completion of the work should not inhibit the objective and thorough evaluation of the environmental impact of the project as required by NEPA. Although the attitude of the defendants is understandable, nevertheless, as the Court interprets NEPA, the Congress of the United States is intent upon requiring the agencies of the United States government, such as the defendants here, to objectively evaluate all of their projects, regardless of how much money has already been spent thereon and regardless of the degree of completion of the work."

The Court is of the opinion that the defendants may approach the problem of the ongoing project differently from a new project, but the end product should

be essentially the same in both cases. For instance, the evidence indicates that the defendants will require, by their own regulations and policies, elaborate hearings spaced out over a long period of time (indeed, several years) with respect to the environmental impact of *new* projects. NEPA would not require the same approach with respect to ongoing projects. Any reasonable procedure would be adequate so long as the "detailed statement" requirements of the Act, along with the other applicable provisions of § 102, are complied with.

A memorandum from the Honorable David Packard, Deputy Secretary of Defense, dated August 8, 1970, directed to the Secretary of the Army, among others, upon the subject "Interim Guidelines on Environmental Statements," which the Court notices, states in part:

"e. *Projects or Programs Initiated Before January 1, 1970.*—Consistent with the above guidelines, an environmental statement shall be filed on actions significantly adversely affecting the quality of the environment even though the actions arise from projects or programs initiated prior to the enactment of the NEPA on January 1, 1970. Where it is not practicable to reassess the basic course of action, further incremental major actions should take into account environmental consequences not fully evaluated at the outset of this project or program."

The building of the embankment across the Cossatot is obviously a "further incremental major action" within the meaning of Mr. Packard's memorandum. It is also obvious that the impact statements of October 5, 1970, and January 22, 1971, did not take into account "environmental consequences not fully evaluated at the outset" of the Gillham Dam project. See discussion below.

But it is not necessary to look at administrative interpretations of the law. The NEPA itself is clear. That Act was not complied with here for the following reasons, among others:

(1) The defendants did not "utilize a systematic, interdisciplinary approach" in evaluating the environmental impact of the dam, which would "insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment" as required by § 102(2) (A). Here again it can be argued that this provision should be restricted to the planning and decisionmaking with respect to new projects. The Court thinks otherwise. It is not too late to use such an approach in the compiling of information required in the impact statement, which information could then be taken into consideration in determining to go forward with the project, to abandon the project, or to restudy the whole matter.

(2) It does not appear that methods and procedures have been developed in consultation with the Council on Environmental Quality which would permit the defendants to assign values to presently unquantified environmental amenities, so that such values might be taken into consideration in decisionmaking along with economic and technical considerations as required by § 102(2) (B). As a result, the defendants have been unable, as a practical matter, to take into consideration, in estimating costs and benefits, the "value" of the Cossatot as a free-flowing stream. The plaintiffs point out that if such value could be quantified, and if it were thereby assigned a value in excess of 5.5 million dollars, then the benefit-cost ratio for this project would decline to less than one, assuming the utilization of an interest rate of 5¼% as presently recommended for use by the Water Resources Council with respect to new projects.

The testimony of Dr. Frank Craighead, a nationally known ecologist, indicates that it is possible to develop criteria in order to quantify "presently unquantified environmental amenities and values." In fact, this has been done by the classification method adopted in the Wild and Scenic Rivers Act, which Dr. Craighead helped to draft. So even at

this time it is possible to determine the "value" of the Cossatot in comparison with other streams and rivers,[1] even though there are no presently existing criteria which would permit a direct comparison between the Cossatot as a free-flowing stream and the Cossatot as it will be if the dam is constructed.

The Court is not here stating that an environmental impact statement, as required by § 102(2) (C), would be inadequate simply because the defendants and the Council on Environmental Quality had not identified and developed the methods and procedures to quantify such values. The NEPA does not require the impossible. Nor would it require, in effect, a moratorium on all projects which had an environmental impact while awaiting compliance with § 102(2) (B). It would suffice if the statement pointed out this deficiency. The decisionmakers could then determine whether any purpose would be served in delaying the project while awaiting the development of such criteria.

(3) The statements did not set forth all of the environmental impacts (which would result from the construction of the embankment), which are known to the defendants by their own investigations or which have been brought to their attention by others.

(4) The statements do not adequately set forth the "adverse environmental effects which can not be avoided" should the dam be built as planned.

(5) The statements do not adequately explore the "alternatives to the proposed action."

(6) The statements do not adequately bring to the reader's attention all "irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

(7) The evidence does not indicate that, prior to making the statements, the defendants did "consult with and obtain the comments of" all Federal agencies which have "jurisdiction by law or special expertise with respect to any environmental impact involved."

(8) The statements do not include the "comments and views" of *all* appropriate "State and local agencies which are authorized to develop and enforce environmental standards."

(9) The evidence does not indicate that the "statements and comments and views" of all of the appropriate Federal, State and local agencies did "accompany the proposal through the existing agency review process."

(10) Neither the statements themselves, nor the evidence introduced, indicates that the defendants have studied, developed or described "appropriate alternatives to recommended courses of action" in connection with this project, which project clearly "involves unresolved conflicts concerning alternative uses of available resources." Section 102(2) (D).

The Court in its Memorandum Opinion Number Four discussed the deficiencies of the first impact statement. On January 22, 1971, the defendants filed a new or "updated" environmental impact statement with the Council on Environmental Quality. This statement is in evidence as Defendants' Exhibit 12. It is not substantially different from the original impact statement, Plaintiffs' Exhibit 7, which was filed on October 5, 1970. In the making of the original and the new impact statements, the defendants simply "recast" the information already in their files. The testimony of the defendants is very candid and forthright in this respect. They felt that such an approach was the only "practical" means of handling impact statements for this type of project. No attempt was made to consider environmental consequences that were not fully considered or evaluated previously during the life of the project. Furthermore, in revising their

---

1. According to the rating system (which gives a nationwide equivalency) the Cossatot is an "excellent" stream for fishing purposes and on the line between "very good" and "excellent" for boating purposes.

environmental impact statement, the defendants did not even take into account the contentions of the plaintiffs as reflected in the testimony received in this court at the preliminary hearing on November 24 and 25, 1970. No understanding of the issues raised in this suit can be gleaned from a reading of the new statement.

No new studies have been made by the defendants on the Gillham Dam project since the enactment of NEPA. The defendants began drafting the environmental impact statement on this project on July 7, 1970, and continued to work on the statement until January, 1971, but no new information was gathered for this purpose.

▮▮ At the very least, NEPA is an environmental full disclosure law. The Congress, by enacting it, may not have intended to alter the then existing decisionmaking responsibilities or to take away any then existing freedom of decisionmaking, but it certainly intended to make such decisionmaking more responsive and more responsible.

The "detailed statement" required by § 102(2) (C) should, at a minimum, contain such information as will alert the President, the Council on Environmental Quality, the public, and, indeed, the Congress, to all known *possible* environmental consequences of proposed agency action. Where experts, or concerned public or private organizations, or even ordinary lay citizens, bring to the attention of the responsible agency environmental impacts which they contend will result from the proposed agency action, then the § 102 statement should set forth these contentions and opinions, even if the responsible agency finds no merit in them whatsoever. Of course, the § 102 statement can and should also contain the opinion of the responsible agency with respect to all such viewpoints. The record should be complete. Then, if the decisionmakers choose to ignore such factors, they will be doing so with their eyes wide open.

The inadequacies of the defendants' impact statements become quite apparent when one examines the evidence introduced at the preliminary hearing in November and at the hearing on the merits in February, 1971. (Note: It was understood and agreed that the evidence introduced at the November hearing would not be repeated but would be considered, where relevant, as part of the evidence in the trial on the merits. An analysis of much of the testimony introduced at the original hearing will be found in the Court's Memorandum Opinion Number Four and will not be repeated here.)

Both the new and old impact statements refer to certain benefits which defendants claim will result from the completion of the project. These include enhanced water quality, a source of dependable water supply, enhanced fish and wildlife, outdoor recreational opportunities, economic redevelopment, enhanced value of the lands adjacent to the river and downstream from the dam, enhanced natural beauty, and flood control. The statement sets forth the currently estimated benefit-to-cost ratio of 2.2 to 1.0, with over 75% of the total annual benefits of $1,191,000 derived from flood control.

Although the impact statements refer to the creation of outdoor recreational opportunities, the defendants do not "formally" claim recreational benefits as part of their benefit-to-cost ratio. The evidence reflects that no effort has been made to determine whether any recreational losses or "costs" will result from the damming of the Cossatot. It seems obvious that if it is asserted that the project will result in increased recreational opportunities, then some effort should be made to compare this claimed benefit with the "cost," if any, which will result from the destruction of stream-type recreation, which is clearly becoming increasingly scarce in the region in which the Cossatot is located.

The trial of this case brought out and dramatized the differing viewpoints and interests in the various agencies and departments within the federal government itself. Many of the plaintiffs' witnesses have worked actively with governmental

**760**

agencies, as consultants, or otherwise, during their careers. One of the plaintiffs' witnesses was Mr. Roy Wood, a native of Arkansas, who is now Regional Director for the Southeastern United States (which includes Arkansas) of the Bureau of Outdoor Recreation of the Department of the Interior. It is his responsibility to review and comment on environmental impact statements. Mr. Wood was formerly with the Arkansas Game and Fish Commission. He is very familiar with the Cossatot, having fished it many times. He describes such experiences as "memorable" and the Cossatot itself as "outstanding" and "somewhat unique."

Although the defendants, in response to Mr. Wood's request, sent him a copy of the impact statement and specifically asked for his comments by October 15, 1970, Mr. Wood indicated that his office had not had an opportunity to review the matter and to make its comments and views known to the defendants. The defendants, therefore, did not include any comments from BOR in the impact statements as filed. (Note: The defendants did not send to Mr. Wood's office, prior to the hearing on the merits, a copy of their second impact statement.)

Mr. Wood expressed a high regard for the flat water recreational opportunities which have been created as a result of the damming of many rivers and streams in Arkansas. Nevertheless, it was clearly his opinion that we were reaching the point of oversupply of flat water recreation in comparison with the ever-diminishing resource of stream-type recreation. His plea was for variety and diversity. He would strive to create a balance in recreational opportunities in the area. One of the defendants' witnesses, Mr. Robert Jenkins, Director of the National Reservoir Research Program for the Division of River Basin Studies of the Fish and Wildlife Service of the Department of the Interior, appears (not only from his testimony but from his published works) to agree with Mr. Wood's professional opinion.

It cannot be doubted that the damming of the Cossatot will reduce the diversity and variety of choice of recreational opportunities and will reduce the choice of beneficial uses of the environment in that region. It should be noted that the proof indicated that approximately one third of all fresh water anglers in the United States prefer stream-type fishing to lake-type fishing.

Although the impact statement claims benefits for enhanced fish and wildlife, the evidence indicates that there are a number of serious possibilities for injury to fish and wildlife which might occur if the dam is constructed. These possibilities have not been adequately explored by the defendants. In addition to such possibilities which were referred to in the Court's Memorandum Number Four, the testimony at the trial in February indicates that the changed ecology resulting from the construction of the dam might result in a dramatic increase in the population of black flies and mosquitoes because of the substantial reduction in the numbers of fish that feed upon the larvae of these insects.

It appears that neither the defendants nor anyone else has yet made a complete "collection" or inventory of the fish life of the Cossatot. Plaintiffs' witness Dr. Clark Hubbs, a prominent ichthyologist, was of the opinion that such a collection would be the beginning point of any serious study of the possible consequences of the construction of the dam upon the stream's fish life. There was evidence that such a collection might take anywhere from six months to a year to complete. Several more years might be required for a follow-up or physiology study. The Court is not here stating that such a collection or study would be required in order to comply with NEPA. But the opinions of such qualified professionals as Dr. Hubbs and Dr. Emlen should be made a part of the impact statement. The decisionmakers can then determine whether to proceed without such a study or to postpone the project while such study is being undertaken.

It will be recalled that both impact statements claimed benefits for the project from "enhanced water quality" or "water quality control." Since the Cossatot in its present free-flowing state appears to be of very high quality, pure, and substantially free of pollution, the Court had some difficulty in understanding the defendants' position. It appears that the reasoning is as follows: After the construction of the dam, defendants believe that there will be increased economic and industrial development, with resulting population growth, especially in the area below the dam. This growth and development will, based on past experience, result in the pollution of the river in the future. Therefore, the dam is designed to store a certain quantity of water which may later be released to dilute the pollution and thereby enhance the water quality. This is the same type of "bootstrap" argument which the defendants use in one of their claims for flood control benefits: The dam will result in new economic and industrial development and population growth, which obviously will result in the construction of many new structures in the present flood plain, the value of which structures will then be protected from flood by the dam. Although the reasoning is circular, it is not without merit. It appears to the Court that the defendants are correct in believing that if the dam is constructed, there will be increased economic and industrial development below the dam and, as a consequence, increased pollution and increased construction. But the Court does not believe that a proper claim for water quality benefits resulting from the dam can be made without at the same time including some statement with regard to the water quality "costs" which would result from the destruction of the Cossatot as a free-flowing stream.

As is traditional with projects of this type, defendants have placed a great deal of emphasis upon economic factors and the economic "benefits" which they claim will result from the implementation of the project. Their claims in this respect should be included in any fully developed impact statement. The NEPA contemplates that environmental factors should be taken into consideration "in decisionmaking along with economic and technical considerations." [2] Section 102 (2) (B). By the same token, a critical analysis of defendants' economic claims by those opposing the project, such as the plaintiffs here, should also be included in any complete impact statement. The testimony of Dr. Paul Roberts was illuminating in this regard. His testimony makes it clear that the choice of "interest" rates can, and will, have a dramatic impact upon the "cost-benefit" ratio. The $2\frac{5}{8}\%$ rate used with respect to this project appears to have been based simply upon historical accident. That was the rate prescribed, and in use, at the time the project was originated in 1957–58. The current rate—which is obviously much more reasonable in terms of the present value of money—is $5\frac{1}{4}\%$. The use of the latter figure would drastically reduce the benefit-to-cost superiority of this project. In like manner, when the Gillham project was conceived, a 100-year "life" was used. Presently, the standard is 50 years for such projects. These are examples only of the testimony of Dr. Roberts, but they indicate the importance of including such information in the impact statement.

Section 102(2) (C) (iii) requires the impact statement to discuss the alternatives to the proposed action. The most glaring deficiency in this respect is the failure to set forth and fully describe the alternative of leaving the Cossatot alone. Furthermore, the statement does not adequately consider nonstructural alternatives for flood control, such as flood plain management (although defendants referred to it in the impact statement), private or publicly subsidized insurance, or outright acquisition of the fee title to the land in the flood plain.

The impact statement does not discuss the "dry pool" reservoir alternative

---

2. Furthermore, an economic analysis can be useful in evaluating actual environmental impacts.

to the proposed dam. Basically this suggested alternative would result in a structure under or through which the stream could flow in its normal manner. During times of flooding, the river could be dammed and the water backed up into the "dry" reservoir. Of course the Gillham project has anticipated water quality and water supply benefits in addition to the benefit of flood control. The "dry" reservoir would in effect, be a single-purpose (flood control) project. But this alternative should be mentioned in the statement and considered along with known alternatives for providing the needed water supply to the communities which obtain their water, or seek their water, from the Cossatot. In other words, if there exists any alternative which would satisfy all of the competing interests—that is, an alternative in which all of our citizens could "have their cake and eat it too"—this should be made explicit in any "detailed statement" required by NEPA. After all, § 102(2)(D) requires the defendants to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

Although it is not of too much consequence, in the Court's opinion, the evidence at the February hearing indicates that, statistically, a flood such as that which occurred in 1968 (the maximum flood of record on the Cossatot River) can be expected to occur with a frequency of once in between 100 and 200 years, rather than with a frequency of once in every 40 years as suggested by the testimony at the preliminary hearing. That evidence also indicates that there is no record of the stream ever being without flow. The minimum flow registered was 1.2 cubic feet per second. The plaintiffs also proved at the February hearing that, had the Gillham Dam, as planned, been in place at the time of the 1968 flood, the stage of the river would have been reduced from 22.6 feet to 19.6 feet. But the Court notes that this 3-foot reduction in stage would have dramatically decreased the flooding and consequent flood damage.

It is clear why an overwhelming majority of the people living near the Cossatot, and particularly along its lower reaches, are so strongly in favor of the construction of the dam. Their interests and viewpoints should, of course, be carefully set forth in the impact statement along with the views of those who oppose the project. Their economic interests, the obvious flood control benefits along the lower reaches of the Cossatot (which would result from the construction of the dam), and the degree of the completion of the project, might, indeed, outweigh all other considerations in the view of the decisionmaker. But, again, the NEPA attempts to establish a procedure which will insure that that decisionmaker is aware of all known alternatives and possible consequences at the time the decision is made.

If it is necessary to spend large sums of money to adequately comply with the requirements of NEPA, it would be relevant in interpreting the provisions of that Act to ascertain if such funds were made available, or are available, to meet the requirements of the Act. The testimony in this respect was somewhat confusing. But the Court concludes that the defendants may utilize existing resources, which are adequate, for such purposes. Of course, this would be a problem only in the current year. In the future, the affected agencies can request as part of their annual budget requirements appropriations to comply with NEPA.

The defendants argue that the making of appropriations for this project on a continuing and yearly basis evidences the legislative intent that the project should be completed without regard to NEPA. The Court does not agree with this argument. It is more reasonable to assume that the Congress, in making annual appropriations for such projects, assumes that the responsible agencies are complying with all applicable laws. Furthermore, the report of the Senate Committee on Appropriations on HR 18127, 91st Congress, 2d Session (S.Rep. No. 91–

118, 91st Cong., 2d Sess.), covering, *inter alia*, the defendants' "Civil" appropriations for the year ending June 30, 1971, states in part:

"The committee has received objections, based on environmental grounds, to many programs and projects for which funds are included in this bill. The objections are principally based on the failure of the agencies involved to file the five-point statement required by the National Environmental Policy Act of 1969. The agencies were given until June 1, 1970, to prepare their procedures for implementing that act. The committee has been informed that the required statements are in preparation. In most cases, the projects objected to have been under construction for some time. The fact that the committee has recommended funds in this bill does not exempt the construction agencies from complying with the provisions of that act as currently applicable."

■■■■ The Court concludes that the Complaint should be dismissed as to the "Corps of Engineers of the United States Army;" that plaintiffs' First and Eleventh Causes of Action set forth claims upon which relief can be granted against the remaining defendants; that, since said defendants have not complied with the provisions of NEPA, they are proceeding in excess of their statutory authority and, therefore, this suit is not barred by the doctrine of sovereign immunity; that the Court has jurisdiction of the parties and the subject matter; that compliance with the requirements of NEPA is a condition precedent to the named individual defendants' exercise of their authority to proceed with the Gillham Dam project, since the construction of the dam is a "major Federal action significantly affecting the quality of the human environment" within the meaning of § 102(2) (C) of NEPA; that, unless restrained, the defendants will proceed to sign and execute a construction contract for the embankment across the Cossatot and for the clearing of the reservoir area; that plaintiffs have no adequate remedy at law; that plaintiffs will be irreparably injured if the defendants are not enjoined from proceeding with the Gillham Dam project; that neither of the environmental impact statements filed by the defendants is a "detailed statement" within the meaning of § 102(2) (C) of the National Environmental Policy Act of 1969; and that the Gillham Dam project involves unresolved conflicts concerning alternative uses of the available resources, but, nevertheless, defendants have not complied with the requirements of § 102(2) (D) of NEPA. These conclusions are in addition to those contained elsewhere in this memorandum and in all prior memorandum opinions entered herein.

As pointed out in the Court's third memorandum, the defendants have at all times been free to proceed administratively in order to comply with the provisions of NEPA. They could, indeed, have done so after the hearing in November. They can do so now. At any time when the defendants are in a position to tender, and do so tender, to the Court evidence of their compliance with NEPA, the injunction will be dissolved.