NOVEMBER 6, 1971

No. A–483. COMMITTEE FOR NUCLEAR RESPONSIBIL-ITY, INC., ET AL. *v.* SCHLESINGER, CHAIRMAN OF ATOMIC ENERGY COMMISSION, ET AL.

See: —— U. S. App. D. C. ——, ——, ——, 463 F. 2d 783, 788, 796.

*David Sive* argued the cause for applicants. With him on the application for injunction were *Harold P. Green* and *Thomas B. Stoel, Jr.*

*Solicitor General Griswold* argued the cause for respondents.

MR. JUSTICE DOUGLAS.

I would grant the injunction so that the case can be heard on the merits. The most serious question tendered is whether the Atomic Energy Commission (AEC) has satisfied the mandate of the National Environmental

Policy Act of 1969, 83 Stat. 852, 42 U. S. C. § 4321 *et seq.*
By § 102 (2)(C) of that Act,[1] 42 U. S. C. § 4332 (2)(C),
Congress directed each agency of the Federal Gov-
ernment to "include in every recommendation or report
on proposals for legislation and other major Federal
actions significantly affecting the quality of the human
environment, a detailed statement by the responsible offi-
cial on—

> "(i) the environmental impact of the proposed
> action,
> "(ii) any adverse environmental effects which can-
> not be avoided should the proposal be implemented,
> "(iii) alternatives to the proposed action,
> "(iv) the relationship between local short-term
> uses of man's environment and the maintenance and
> enhancement of long-term productivity, and
> "(v) any irreversible and irretrievable commit-
> ments of resources which would be involved in the
> proposed action should it be implemented."

I agree with the Court of Appeals for the District of
Columbia Circuit in *Calvert Cliffs' Coordinating Com-
mittee, Inc.* v. *Atomic Energy Commission,* 146 U. S.
App. D. C. 33, 39, 449 F. 2d 1109, 1115, that "if
the decision [under NEPA] was reached [by AEC] pro-
cedurally without individualized consideration and bal-
ancing of environmental factors—conducted fully and in
good faith—it is the responsibility of the courts to
reverse."

That opinion, rendered on July 23, 1971, by a panel
consisting of Judges Wright, Tamm, and Robinson,
found that AEC's procedures in this nuclear area did
not comply with the Act and that its entire approach

---

[1] Guidelines for agency action are provided by the Council on
Environmental Quality of which Russell E. Train is Chairman. See
36 Fed. Reg. 7724.

to the environmental problems in the nuclear field violated the Act.

Another panel of the same Court of Appeals, composed of Judges Bazelon, Leventhal, and Robinson, said in the instant case, after examining *in camera* the relevant environmental documents,

> "We are left with difficult questions about the validity of the AEC's environmental statement.[2] But a hurried review of several hundred pages of technical documents cannot provide a satisfactory basis for resolving this litigation." —— U. S. App. D. C. ——, ——, 463 F. 2d 796, 798.

In that opinion the Court of Appeals did not approve the findings of the District Court that the order complies with the Act, saying, "In our view the case does present a substantial question as to the legality of the proposed test."

I have added in an appendix some apparently obvious defects in AEC's Impact Statement (hereafter sometimes I. S.).

---

[2] As the Court of Appeals held in an earlier opinion in this case, —— U. S. App. D. C. ——, ——, 463 F. 2d 783, 786, Congress did not intend, by approving funds for the Cannikin detonation, to repeal the NEPA as it applied to the test.

"On the contrary, there is an affirmative indication that at least some of the Congressmen voting for the authorization and appropriations measures specifically contemplated that the claim of illegality remained for resolution by the courts."

See Remarks of Rep. Price, 117 Cong. Rec. H6785, July 15, 1971:

"This matter is before the court. I submit that if there has been any violation of the law, the court will supply the appropriate remedy."

Other federal courts have similarly concluded that congressional appropriations for a project subject to NEPA are not to be taken as expressing any view with respect to compliance with NEPA. *Environmental Defense Fund* v. *Corps of Engineers*, 325 F. Supp. 749, 762–763.

We plainly do not have time to resolve this question between now and the scheduled detonation. Accordingly, I would grant the injunction so that a full Court can consider the case on the merits.

## APPENDIX TO OPINION OF DOUGLAS, J.

In the *Calvert Cliffs* case the Court of Appeals held that the procedural rules adopted by AEC for the preparation of Environmental Impact Statements did not meet statutory requirements. And in the October 5, 1971, opinion by the Court of Appeals in the instant case it is held that *"responsible* opposing views" on environmental damage "need be included" in the Impact Statement in the form of "a meaningful reference that identifies the problem at hand for the responsible official." — U. S. App. D. C. —, —, 463 F. 2d 783, 787.

The Act requires that reports from federal agencies required by the Act and the guidelines of the Council on Environmental Quality (CEQ) to be consulted with respect to the preparation of an Impact Statement, which are adverse to the project with respect to which their views are sought, must be released as part of the Impact Statement prepared by' the agency responsible for the project.

Here, several such reports were not disclosed. The existence of these reports became known through newspaper stories and debates on the floor of Congress. These reports were the subject of the discovery proceedings which caused such a long delay in this litigation. The reports in question included those of:

(a) Russell Train, Chairman of CEQ;

(b) Edward E. David, Jr., Director of Office of Science and Technology (OST);

(c) William D. Ruckelshaus, Administrator of Environmental Protection Agency (EPA); and

(d) Glenn T. Seaborg, Chairman of the AEC.

The CEQ guidelines specifically state that the exemptions in the Freedom of Information Act, 5 U. S. C. § 552, are not applicable to agency comments made in the course of consultations with reference to the preparation of an Impact Statement. The Act and § 7 of the guidelines direct that an agency charged with the preparation of an Impact Statement "consult with, and obtain the comment on the environmental impact of the action of, Federal agencies with jurisdiction by law or special expertise with respect to any environmental impact involved." 36 Fed. Reg. 7725. The EPA is specifically designated to be one of the agencies within the contemplation of § 7, *ibid.* And under § 10 (f) of the regulations, the AEC would be the agency "responsible for making the statement and the comments received available to the public pursuant to the provisions of the Freedom of Information Act." *Id.*, at 7726. Besides the express designation of the EPA, the argument is compelling that the other agencies in question have "special expertise" and, in the case of the AEC, "jurisdiction by law" concerning the various environmental effects to be expected from an underground nuclear explosion.

Once noncompliance with the NEPA is shown, the federal courts have uniformly held that injunctive relief is appropriate.

Disclosure of these statements to the public by any federal agency which has "special expertise with respect to any environmental impact involved" is indeed required by § 102 (2)(C) of the Act. And the courts have consistently held that a defect in the Impact Statement presents a justiciable question and is the basis for equitable relief. *West Virginia Highlands Conservancy* v. *Island Creek Coal Co.*, 441 F. 2d 232; *Environmental Defense Fund* v. *Corps of Engineers*, 325 F. Supp. 749, 759; *Wilderness Society* v. *Hickel*, 325 F. Supp. 422.

*Seismic Dangers:*

According to the Impact Statement, "No significant environmental impact can be expected from the seismic activity caused by the CANNIKIN test." I. S. 3. Two sorts of seismic effects are at issue. First, there is the possibility that the explosion might trigger a natural earthquake of greater force than the bomb itself. The Impact Statement asserts that:

> "The possibility of the CANNIKIN test 'triggering' an earthquake with seismic energy comparable to or greater than that produced by the explosion itself is very unlikely. Since the understanding of earthquake mechanisms is still developing and is not yet sufficient for exact calculations, the possibility of such an occurrence cannot be ruled out. However, foremost seismologists have asserted that an explosion at Amchitka will not trigger a large earthquake . . . unless the occurrence of such an event is imminent, very near to the test site." *Ibid.*

This conclusion is based on nothing more than an assertion to this effect by "[a] panel of eminent scientists and engineers . . . acting as consultants to the AEC," *id.,* at 54, which was presumably based, in turn, on

> "the size and location of the CANNIKIN explosion, considered along with the size and frequency of naturally occurring earthquakes and the experience gained by observation of past nuclear detonations and aftershocks." *Id.,* at 3.

That more should be required is clear from the heretofore secret memorandum written by Russell Train of the CEQ (hereafter Train memo), the agency charged with the broadest statutory authority in establishing national environmental policy.

According to Mr. Train,

"All the earthquakes triggered by underground explosions in the various Nevada tests released substantially less energy than the explosion itself. If one could establish that this is a necessary condition then there would be no apprehension with regard to the CANNIKIN event. Unfortunately, this is not the case. The magnitude of the triggered earthquakes will depend on the state of strain in the crust in the general region at which the underground explosion is set off. Extrapolation from the Nevada experience is uncertain because of the fundamentally different geologic setting between Nevada and the Aleutians. Further, experience with MILROW [a one-megaton underground detonation set off on Amchitka in 1969] does not provide a sure basis for extrapolation. In the highly nonlinear phenomena involved in earthquake generation, there may be a threshold value of the strain that must be exceeded prior to initiation of a large earthquake." Train memo 4.

Mr. Train goes on to explain that "great earthquakes" (those with a force of 8.0 or more on the Richter scale) are now considered to result from the cumulative effects of a series of smaller shocks. (CANNIKIN is expected to register about 7.0 on the Richter scale.) Referring specifically to great earthquakes occurring within the past few years in Chile and Alaska, he notes that the theoretical explanation for these events justifies a concern that the force of CANNIKIN, which would be the largest underground device exploded by man, might surpass the "threshold" required to trigger a great quake.

"The suggested explanation of the Chilean and Alaskan earthquakes in terms of a succession of smaller earthquakes would support this interpretation. In

this model a number of lock points stabilize a fault. Once one lock point is broken, sufficient energy may be released to break other lock points. If the stored strain energy is large, then the triggered earthquake could be of much greater magnitude than the triggering event. The underground explosion could serve as the first domino of the row of dominoes leading to a major earthquake. The major fault in the general region of Amchitka is thought to be some 40 km. beneath the test shot. The strain field will certainly be altered at this depth by the underground explosion. Observations on the BENHAM event [a one-megaton detonation at the Nevada test sites] showed strains exceeding tidal strains at 29 km." *Ibid.*

The CANNIKIN yield may be as high as five times that of the BENHAM and MILROW devices.

The "lock-point" theory is also explained in a statement by J. W. Hadley (hereafter Hadley memo), which had also been suppressed until this week. The theory is nowhere discussed, nor even "alluded to," in the Impact Statement.

A further misleading conclusion in the Impact Statement is that CANNIKIN could not trigger a natural quake unless that quake "is imminent, very near to the test site." The documents revealed this week indicate there is a possibility that earthquakes may be triggered by a rise in underground fluid levels, or by artificial loading of the earth's crust. Presumably, the fluid lubricates the rock along a fault line, thus enhancing the potential for slippage. A series of earthquakes along a dormant fault near Denver has been definitely attributed to the pumping of waste water deep into the earth by the Rocky Mountain Arsenal. Train memo 2–3.

"A second example is found in the case of earthquakes associated with large lakes or reservoirs. As

a result of loading of the earth's crust by these large bodies of water or by the modification of the ground-water flow or for some other reason not yet understood, substantial earthquakes have been associated with construction of large artificial lakes. A recent earthquake near Koyna Dam in India located in an area that is not normally seismic killed about 200 people. Similarly, many small earthquakes occurred when Lake Mead was filled." *Id.,* at 3.

Increased subsurface fluid pressure will be one result of CANNIKIN.

"[T]he explosion will alter the pressure regime in the groundwater. The water pressure in the rocks interstices will increase due to the compaction of the ground around the cavity. . . . This increase in the fluid pressure will reduce the friction between fracture separated blocks. The effect would be greatest on faults oriented parallel to the residual compressive stresses resulting from the test explosion. Thus, it is possible that the mechanism involved in the Denver earthquake would raise the probability of triggering a large earthquake." *Ibid.*

Thus, it would appear that "imminence" may not be necessary for CANNIKIN to trigger a large earthquake. This possibility is not mentioned in the Impact Statement.

The Impact Statement also fails to consider the long-term effects of the CANNIKIN device on the geology. "The creation of a large cavity together with a later collapse of the chimney produces permanent changes in the strain field. . . . However, the strain field resulting from an underground explosion cannot be calculated with any precision because of the dependence of the field on the detailed geology which is largely unknown at any given location." *Ibid.*

Not only does the Impact Statement fail to assess the possible effects of permanent changes in the strain field, but it represents that the geologic conditions at Amchitka have been fully explored.  I. S. 19.

Perhaps the most striking deception of the Impact Statement, in light of the Train memo, is its attempt to represent that professional opinion is unanimous that there is no real danger that CANNIKIN will trigger a large earthquake.  According to Mr. Hadley, however,

> "Qualified scientific opinion is in good agreement that the possibility of triggering a large earthquake by CANNIKIN is remote, but real. . . .  Variation of technical opinion from this position is minor."  Hadley memo 6.

The second seismic effect which might result from CANNIKIN is a tsunami, or tidal wave.  According to the Impact Statement, "the possibility of the CANNIKIN explosion or an earthquake causing a damaging tsunami (seismic sea wave) is even more unlikely [than the triggering of a great earthquake]."  I. S. 3.  The Train memo itself points out, "Large earthquakes in the near vicinity of Amchitka have not caused destructive tsunamis in the past."  Train memo 4.  Train goes on, however: "[A]s in the case of earthquakes it is not possible at this time to assess quantitatively the probability of a tsunami following the explosion."  *Id.,* at 4–5.  Another heretofore suppressed statement, that of Dr. W. G. Van Dorn, entitled Probability of Tsunami Generation and Connection with CANNIKIN, indicates the author to be as deeply concerned about the danger from the explosion as the "well-qualified geophysicists" who believe that the risks are great, and whose views are contained in an attachment to the Train memo.  Those views remain suppressed.  Considering the awesome destructive capabilities of even a

"small" tsunami, and its ability to retain its destructive force thousands of miles from its source, it would seem incumbent upon the drafters of the Impact Statement to explore in greater detail the sources of such responsible concern.

*Venting:*

The second category of environmental hazards from the CANNIKIN event are those relating to the danger that radioactive material from the explosion might escape to the surface. The most serious problem is the effect on groundwater movement, for the water table on Amchitka extends almost to the surface.

According to the analysis of the Impact Statement, the most probable mode of groundwater circulation by which radionuclides might escape into the sea would take "a thousand years or more." I. S. 24. The least likely

> "involves the very unlikely assumption that the water within the cavity-chimney system becomes completely mixed [with radionuclides, predominately tritium], coupled with a second unlikely assumption that the flow through the rock occurs only through a system of interconnecting fractures. Estimates using these assumptions indicate contaminated water would reach the sea in . . . some three years after the explosion. This would introduce tritiated [radioactive] water into the ocean with an initial concentration about 1,200 times that of the RCG [recommended concentration guideline] for water." *Ibid.*

Indeed, the Impact Statement thinks it far more probable that only "some small fraction of the tritiated water" will "move upward in the chimney rubble." And only relatively near the surface will increased perme-

ability provide a path to the sea. The Impact State-
ment estimates that no tritium would be released into
the water for over a hundred years through this mech-
anism. *Ibid.*

The Train memo, however, relying on calculations
from the United States Geological Survey, comes to a
different conclusion.

> "Water in the chimney would move to the sea at
> a rate dependent on the hydraulic head, the perme-
> ability of existing aquifers and permeability of any
> new fractures opened up by the explosion. USGS
> calculations indicate a time for such movement
> might be as short as one to two years. These are
> short times and are inconsistent with estimates made
> by AEC that tritium will be discharged into the
> ocean only 145 years after the explosion. . . . If
> the shorter times (5 to 10 years) postulated above
> are correct then the level of radioactivity in the
> groundwater entering the ocean would be in excess
> of ten thousand to one hundred thousand maxi-
> mum permissible concentration for water." Train
> memo 5.

Thus, the judgment of the Chairman of the Council on
Environmental Quality is that it is likely, if not probable,
that within 10 years of CANNIKIN, radioactive water
of concentrations perhaps 100,000 times permitted maxi-
mums will reach the sea near Amchitka. Inasmuch as
this estimate is 100 times greater than their own, I
should think it would require consideration by the
drafters of the Impact Statement.

Another document shown to the applicants herein for
the first time this week supports the Train analysis:

> "[I]t must also be admitted, and this is the basis for
> the Council on Environmental Quality's [Train's]

comments on CANNIKIN, that the rubble chimney constitutes a highly permeable vertical short circuit of the groundwater system, and that the hydrological measurements indicate zones of fairly permeable rock higher in the section." M. Merritt, The Ground Water Problem at Amchitka 1–2.

The USGS recognized that its water migration time scale was highly inconsistent with that of the AEC; in so doing, it reaffirmed its original position:

"It should be emphasized that the foregoing analysis is heavily weighed in favor of the worst case. However, it is difficult to conceive of conditions which might improve the outlook significantly." USGS, Effects Evaluation Report—Cannikin Event.

The AEC was aware of the USGS position with respect to groundwater migration. It simply ignored it.

More disturbing than the failure of the Impact Statement to meet the arguments advanced by its critics, perhaps, is a deliberate distortion, in certain instances, of those opposing views. Thus, the statement argues that even were the "extreme case" to occur, and radioactive water migrate to the sea within a few years,

"dilution of that water by the sea water would take place rapidly. With the seeping water being swept up by the passing ocean current and mixed through tidal action and wave action, oceanographers have estimated that there would be an effective dilution factor of about 100,000 within a few hours. In this manner, the sea water tritium would quickly dilute to levels comparable to those freshwater levels acceptable for lifetime use by humans." I. S. 25.

Compare this use of the dilution figure with that of Train:

"Even if the dilution is as great as a hundred thousand, there is the possibility of concentration of tri-

tium well above background levels in various steps of the food chain." Train memo 5.

MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL would grant a temporary restraining order pending applicants' filing of a petition for certiorari and action by the Court on the petition. The question to be presented is whether the detonation of CANNIKIN would be illegal if the Atomic Energy Commission did not comply with the mandate of § 102 (2)(C) of the National Environmental Policy Act of 1969. The Court of Appeals did not accept the holding of the District Court that the Commission had complied with § 102 (2)(C), stating, "In our view the case does present a substantial question as to the legality of the proposed test." The oral argument confirmed this view. In that circumstance, to avoid mootness, the Commission must be enjoined from proceeding with CANNIKIN until the Court decides whether to review the question of its legality.