**NATIONAL HELIUM CORPORATION,**
Plaintiff,

Phillips Petroleum Company and Cities
Service Helex, Inc., Intervenors,

v.

Rogers C. B. MORTON, Secretary of the
Interior, and Elburt F. Osborn, Direc-
tor, Bureau of Mines, Department of the
Interior, Defendants.

Civ. A. No. W–4568.

United States District Court,
D. Kansas.

June 11, 1973.

Emmet A. Blaes, of Jochems, Sargent & Blaes, Wichita, Kan., Raymond S. E. Pushkar, Herbert L. Fenster, Herbert L. Fenster, Robert L. Ackerly, of Sellers Conner & Cuneo, Washington, D. C., for plaintiff.

Harlington Wood, Jr., Asst. Atty. Gen., Harland F. Leathers, Stuart E. Schiffer, Raymond D. Battacchi, Attys., Dept. of Justice, Washington, D. C., Robert J. Roth, U. S. Atty., E. Edward Johnson, Asst. U. S. Atty., John J. Immel, Wichita, Kan., for defendants.

## DECISION AND OPINION OF THE COURT

THEIS, District Judge.

On March 27, 1971, this Court temporarily enjoined the Secretary of the Interior from terminating the National Helium Conservation Program as implemented by three helium procurement contracts entered into with the plaintiffs prior to a hearing on the merits or, alternatively, a reconsideration by the Department of Interior of its action in the light of the applicable substantive and procedural requirements of the National Environmental Policy Act of 1969, 83 Stat. 852, 42 U.S.C. § 4321 et seq.; the Helium Act, as amended by the Helium Act Amendments of 1960, 74 Stat. 918, 50 U.S.C. § 167 et seq.; and the Administrative Procedure Act, 5 U.S.C. § 551 et seq. National Helium Corporation v. Morton, 326 F.Supp. 151 (D.Kan.1971), aff'd. 455 F.2d 650 (10th Cir. 1971).

Of particular concern to the Court was the failure of the Department of Interior to prepare a final environmental impact statement prior to taking the contemplated action. On February 2, 1973, the Secretary of Interior again determined that the helium procurement contracts should be terminated, since the purposes of the Helium Act of 1960 had been satisfied and, accordingly, notices were sent to the plaintiffs that termination would occur on April 4, 1973, at 8:00 a. m., C.S.T. Having prepared a final environmental impact statement in accordance with § 4332(2)(C) of the National Environmental Policy Act, 42 U.S.C., the Secretary immediately moved for dissolution of the preliminary injunction.

In response to the defendants' notices of termination and motion for dissolution, the plaintiffs filed verified amended complaints seeking, *inter alia,* the continuation of the preliminary injunction pending a full hearing on the merits of the case. They alleged that: (1) the defendants had not complied with the procedural and substantive requirements of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (hereinafter referred to as "NEPA"), the Helium Act Amendments of 1960, 50 U.S.C. § 167 et seq. (hereinafter referred to as the "Helium Act"); and the Administrative Procedure Act, 5 U. S.C. § 551 et seq., prior to the termination of the contracts; (2) the necessary conditions precedent for termination of the implementing contracts and the National Helium Conservation Program had not in fact occurred; and (3) the proposed agency action was otherwise arbitrary, capricious, an abuse of discretion, and not in accordance with law. In support of their allegations, the plaintiffs submitted documents, briefs, and a number of affidavits.

On March 14, 1973, the Court heard oral argument on the defendants' motion to dissolve the preliminary injunction. The defendants contended that since a comprehensive final environmental impact statement had been prepared, upon which the Secretary of Interior had determined to terminate the helium contracts, the Secretary's decision was entitled to a presumption of regularity, and the preliminary injunction should accordingly be dissolved. After a careful examination of the defendants' draft and final environmental statements and the pertinent comments attached thereto, the plaintiffs' amended complaint and supporting affidavits and documents, and the applicable law, the Court overruled the defendants' motion.

■ The Court had already ruled that it had jurisdiction of the suit by virtue of 28 U.S.C. §§ 1331, 1361, 2201 and 2202, and 5 U.S.C. §§ 701–706; that the plaintiffs had standing to raise the issues herein involved; that the termination of these contracts was a major federal action significantly affecting the quality of human environment and posing serious environmental consequences within the meaning of § 4332(2)(C) of NEPA, 42 U.S.C.; that the requirements of NEPA were applicable to the Department of Interior "to the fullest extent possible" in the administration of the Helium Act by virtue of 42 U.S.C. § 4332; that there had been a sufficient showing of a likelihood of irreparable injury to the plaintiffs and the public if the Secretary's action was not enjoined; and that the Secretary's decision was subject to limited judicial review pursuant to § 706(2)(A) of the Administrative Procedure Act, 5 U.S.C., National Helium Corporation v. Morton, supra. Although the Secretary's decision was entitled to a presumption of regularity, "that presumption [was] not to shield his action from a thorough, probing, indepth review." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

Since the plaintiffs' amended complaints and supporting documents presented a substantial controversy involving complex factual and legal issues justifying the maintenance of the status quo pending further hearings, and the Court was convinced that the plaintiffs

had established a probability of ultimate success, thereby justifying the issuance of a preliminary injunction in the first instance in accordance with the standards enunciated in Crowther v. Seaborg, 415 F.2d 437 (10th Cir. 1969), the Court determined that the dissolution of the previous injunction would be a futile gesture. See Environmental Defense Fund v. Corps of Engineers of the United States Army, 325 F.Supp. 749 (E.D. Ark.1971). The Court did, however, require the plaintiffs to post a bond in the sum of $2,000,000 for the payment of such costs and damages as might be incurred by defendants if they were found to have been wrongfully restrained, and determined that this bond, along with the twenty-eight million dollars owed by the Government to the contractors, gave it a thirty million dollar security cushion.

The defendants immediately perfected an appeal of this Court's order denying their motion for dissolution of the preliminary injunction to the Tenth Circuit Court of Appeals. In response to the defendants' request, this Court also certified its subsequent orders denying the defendants' motions for summary judgment on the pleadings pursuant to Rule 56, F.R.Civ.P. and, in the alternative, dismissal of the amended complaints, in part, for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), F.R.C. P. The Tenth Circuit did not rule on any of the orders, but it did direct that the trial on the merits should be held within thirty days on the administrative record, rather than by trial de novo, in conformity with the recent United States Supreme Court decision in Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Having resolved the preliminary matters, reviewed the administrative record as supplemented by the plaintiffs, and heard oral argument, this case is ripe for final disposition.

## FACTUAL BACKGROUND

This is a case of considerable complexity and moment. A basic review of the characteristics of helium and the history and development of this country's helium conservation program, including the role played by the implementing helium procurement contracts herein involved, consequently serves as an instructive prelude to its resolution. The summary which follows was gleaned from the administrative record submitted by the Department of Interior, including numerous departmental studies, compilations, and reports, and is supported by the findings of facts in related litigation in Northern Natural Gas Company v. Grounds, 292 F.Supp. 619, 624–680 (D. Kan.1968), aff'd. 441 F.2d 704 (10th Cir. 1971); Air Reduction v. Hickel, 137 U.S.App.D.C. 24, 420 F.2d 592 (1969); and Northern Helex Co. v. United States, 455 F.2d 546 (Ct.Cl.1972).

Helium is a colorless, odorless, and tasteless gas which, in the present state of scientific knowledge, will not react chemically or physically with any other element, except under laboratory conditions. Helium is non-combustible. It is the second lightest element found on earth next to hydrogen, which is highly combustible. Helium does not liquefy at standard atmospheric pressure until it reaches—452.1 degrees Fahrenheit, almost absolute zero and lower than any other gas. It is the only known gas which can develop superconductivity in metals. It is the best known transmitter of sound and the best conductor of heat at near absolute zero of any gas. It becomes a super fluid near absolute zero. Helium is non-toxic to man and it does not become radioactive.

Since its discovery on the sun by Sir Norman Lockyear in 1868, helium has grown from a laboratory curiosity with no practical applications to one of the most valuable, yet rapidly wasting, elements on earth. As measured by its demand, helium has established itself as a tool in shielded arc welding and other metallurgical applications, lighter-than-air applications, chromatography as a carrier gas, leak detection, heat transfer medium in nuclear power reactors, pressurizing and purging liquid propellants

for space boosters, under sea work as a breathing gas when mixed with oxygen, medical research and therapeutic treatment, cryogenics, and in low temperature research. Helium is also presently being used as a coolant in high-temperature gas-cooled reactors.

Future uses of helium for which research is presently being carried on by the Government and private industry include its application in such areas as power generation by helium-cooled fission reactors, nuclear fusion reactors, superconducting systems of generation and transmission of power, magnetohydrodynamics, and transportation by superconducting magnetic levitation systems, to name a few. In the future, uses of helium are expected to develop which are now unforeseen or unknown.

Before 1960, with minor exceptions, the production and marketing of helium was accomplished by the Bureau of Mines, pursuant to the Helium Act of 1925, 50 U.S.C. § 161 et seq.:

"An act authorizing the conservation, production, and exploitation of helium gas, a mineral resource pertaining to the national defense, and to the development of commercial aeronautics, and for other purposes." 43 Stat. 1110.

The Act authorized the Bureau of Mines to operate plants, to store and care for helium, and to conduct exploration. The Secretary of Interior was authorized to acquire land or interest in land by purchase, lease or condemnation where necessary, to provide helium to supply the needs of the Army, Navy, and other branches of the Government. 50 U.S.C. § 161. Other than a minor amendment of the Act in 1927 in order to permit the limited leasing or selling of helium to aid scientific and commercial development, 44 Stat. 1387, the Act remained essentially the same until 1937. By amendment in 1937, Ch. 895, 50 Stat. 885, to the Helium Act of 1925, Ch. 426, 43 Stat. 1110, the Secretary was directed to purchase, if possible, all properties developed or constructed by private parties for helium production prior to the passage of the amendment.

Until the advent of World War II, the uses of helium outside the laboratory were in lighter-than-air-craft and, when mixed with oxygen, in medicine and deep-sea diving. Since the Government was the predominant consumer of helium, the emphasis of the helium program was accordingly upon meeting current and short-range helium needs. At the commencement of World War II, all helium extraction facilities were owned by the United States, and consisted solely of the Amarillo Plant, located at the Cliffside Field in Potter County, Texas, which had been purchased in 1933.

During World War II, the usefulness of helium was broadened considerably. Four plants were built to meet the greatly increased military need for helium, and during the 1950's demand for helium rose spectacularly due to the development of new uses, including atomic weapons, nuclear energy plants, military and civilian rocketry, exploration of outer space, cryogenics, and other uses connected with both science and industry. As increasing helium demands threatened to outstrip the production capacity of the Bureau of Mines, concern arose regarding the future ability to meet mobilization needs and the causal wastage of the natural resource. In 1957, the Director, Office of Defense Mobilization, recommended to the Secretary of Interior that a working group be established to determine the feasibility of making the conservation aspect of the helium program the primary, rather than incidental, objective of the Department of Interior.

A working group was subsequently established, comprised of representatives from the Departments of Commerce, Defense and Interior, Atomic Energy Commission, Office of Defense Mobilization, Bureau of the Budget, and Federal Power Commission. Headed by then Undersecretary of Interior, O. Hatfield Chilson, now our esteemed colleague on the federal bench in the District of Colorado, the group compiled a study entitled

"Cost and Implementation of a National Helium Conservation Policy." (The Chilson Report, January 24, 1958). As a result of the study, a national helium conservation policy was subsequently recommended to President Eisenhower and formally approved on April 25, 1958.

The Report noted that approximately 99% of the known helium-bearing natural gas resources in the United States was concentrated in four fields containing approximately 119 billion cubic feet of potentially recoverable helium: (1) the Hugoton Field of Texas, Oklahoma and Kansas; (2) the Panhandle Field of Texas; (3) the Keyes Field of Oklahoma; and (4) the Greenwood Field of Kansas. The Report further noted that these fields had been developed by private companies to supply natural gas to fuel markets, and that since the companies merely considered the helium to be a minor impurity no effort was being made to remove it; consequently, the helium was merely passing into the atmosphere without serving any useful purpose.

The study group recognized a number of significant factors suggesting the need for a long term helium conservation program. First, although the demand for helium had been consistently rising, the emphasis of the helium program was on meeting current, short term needs. Second, helium was essential to the country's missile and atomic energy programs, and an invaluable industrial tool. Third, the helium supply being conserved by the Bureau of Mines, although sufficient to meet current foreseeable governmental needs, would likely not be sufficient to meet future governmental and private demands resulting from expected and unforeseeable developments in new and expanding technologies. Fourth, natural gas was the only known commercial source of helium, since recovery from the atmosphere and other sources was impracticable due to the economic and environmental barriers. Fifth, the world's largest helium-bearing gas fields were located in the United States, yet the helium was

being allowed to vent into the air without serving any useful purpose and would probably be totally depleted by 1985. Sixth, due to the inability to place a "value" on helium as a result of the speculative nature of its future demand and the predominant government utilization, there was no economic incentive for private industry to extract and store the helium for future use. Seventh, if nothing was done, the nation's richest source of helium would be least available at a time when it was needed the most. Finally, that present legislation did not permit the implementation of a long-range conservation program as envisioned.

In order that an effective long-range helium conservation program might be implemented, the Report recommended that the Helium Act, 50 U.S.C. § 161 et seq., be amended in such a way so as to give the Secretary of Interior the authority to build up to thirteen new helium production plants to extract the helium prior to transmission of the natural gas to fuel markets, and to store the helium thus conserved in the government-owned Cliffside gas field or in some other suitable underground reservoir. In addition, the Report suggested that it might be feasible to augment this basic conservation plan by acquiring and shutting in relatively small isolated helium-bearing gas fields, although the acquisition of *all* of the fields was thought to be impracticable.

Since it was not certain that private companies would be willing or able to participate in the program, however, and in light of the current and unforeseeable importance of helium to the national welfare, the Report suggested that the legislation be drafted in such a way so as to authorize the Secretary to condemn the helium-bearing natural gas after its removal from place of deposit in nature. Furthermore, although suggesting an end to the long-standing governmental monopoly on the *production* of helium, the Report recommended that the Secretary retain control over the *sale* and *use* of helium produced by private companies

not participating in the program, and thus be able to control the price of the gas and determine its end uses.

Due to the magnitude of the expense involved in accomplishing the conservation program, the Report recommended that: (1) private industry be encouraged to participate in the program by entering long-term contracts with the Government which would give the companies a reasonable return on their capital investment and, at the same time, help to defray the overall costs of the program; (2) the Secretary be authorized to set the price for the helium at a level which would enable the Department of Interior to cover all costs incurred in carrying out the provisions of the program; (3) all federal agencies and contractors purchase all major requirements of helium from the Secretary; and (4) the private companies participating in the program be prohibited from selling any helium to any purchaser other than the Secretary at a price lower than the lowest price paid by any government agency.

In 1958 the Department of the Interior proposed legislation to Congress for the implementation of the recommended conservation program. This was not acted upon, however, and redrafted proposals were subsequently submitted to Congress on July 27, 1959. After lengthy hearings and incidental revisions and amendments of the proposed bill, a legislative amendment was adopted on September 13, 1960, to be known as "An Act to amend the Helium Act of March 3, 1925, as amended, for the defense, security, and the general welfare of the United States." [1] 50 U.S.C. § 167 et seq. The Act became effective on March 1, 1961, and a limitation on the annual contracting authority of 47.5 million dollars was established by the Act of August 3, 1961, 75 Stat. 246, 253.

The 1960 Helium Act Amendments authorized the Secretary of the Interior to enter into long-term contracts for the acquisition, processing, transportation, or conservation of helium, not exceeding twenty-five years. 50 U.S.C. § 167a (a)(2). In addition, he was given the power to acquire, by eminent domain, helium contained in helium-bearing natural gas and so much of such gas as was necessarily removed in the extraction process, if he were unable to acquire helium otherwise upon reasonable terms and at the fair market value. 50 U.S.C. § 167a(a)(2). In an attempt to make the program self-liquidating, the Act provided for a comprehensive system similar to that recommended by the Chilson Report. 50 U.S.C. §§ 167a(c), 167c, 167d and 167j. The Secretary was given authority to set his own price for the helium that he sold (50 U.S.C. § 167d(c)), and to establish and promulgate such rules and regulations, consistent with the directions of the Act, which were necessary to carry out its provisions. 50 U.S.C. § 167g.

Pursuant to the authority given the Secretary by the Helium Act Amendments, the Secretary of Interior entered into helium procurement contracts with the plaintiff companies and with Northern Helex Company in August, October, and November, 1961. These companies were chosen due to the large amount of

---

1. Pub.L. 86–777, 74 Stat. 920. All proceedings were before the 86th Congress. The bill which became the Helium Act Amendments of 1960 was H.R. 10548. Other bills which were considered are S. 827, S. 2567, S. 3376, H.R. 8440, H.R. 8451 and H.R. 11030. The Reports of the hearings before the Committee on Interior and Insular Affairs, United States Senate, on H.R. 10548 and S. 3376, June 1 and 15, 1960, and the Report of Hearings Before the Subcommittee on Mines and Mining of the Committee on Interior and Insular Affairs, House of Representatives on H.R. 8440, H.R. 8451, H.R. 10548 and H.R. 11030, February 19, March 10 and 11, 1960, are printed. The Report of the House Committee is designated H.Rptr. No. 1552 and of the Senate, S.Rptr. No. 1814, U.S.Code Cong. & Admin.News 1960, p. 3595, with a minority report by Senator Carroll designated Part 2. Debate in the House and Senate is reported in 106 Cong.Rec., pp. 9089–9095, 15119–15125, 17855, 18936–18538, 18544–18546, 18602–18609 and 18902–18904.

helium which they could assure, and their ability to accomplish the necessary production assemblage and perform the underlying contracts. The award of the contracts to these four companies obligated all of the available 47.5 million dollars contracting authority and thus completed that phase of the helium conservation program, unless and until the contracting authority was increased. That authority has not been increased by Congress.

Each contract provided for the sale and delivery to the United States of a helium-gas mixture for a term of twenty-two years. The companies were required to construct at their own risk and expense helium extraction plants and necessary facilities capable of processing at least 500 million cubic feet of Hugoton area gas per day (in the case of National Helium, approximately 840 million cubic feet of natural gas per day). The contracts followed a general pattern, although they varied in detail. Each contract contained an initial price per MCF of contained helium varying from $10.30 to $11.78. The prices were broken down into two parts, one related to the cost of gas and the other related to other costs. The companies have at all times fully met their obligations under the contracts.

Subsequent to the implementation of the expanded helium conservation program, numerous studies and reports concerning the program were prepared by federal agencies and by interested private groups and, in accordance with § 167n of the Helium Act Amendments, the Secretary of Interior made annual reports to advise Congress of the current status of the government's helium program. Generally, these reports contained financial, statistical, and operating information concerning the program for each fiscal year that it was in operation.

The helium conservation program apparently ran smoothly until some time in 1968. After the passage of the 1960 Act, however, several private companies had begun their own helium extraction outside of the government program. Because the Secretary's price for helium reflected not only direct extraction costs, but also a portion of the costs involved in the administration of the conservation program, the Secretary's price for helium exceeded the private producers' price. As the private companies' sales increased, the Secretary's sales decreased, despite increased overall demand.

In response to this situation, the Secretary proposed regulations in 33 Fed. Reg. 5219–20 (1968), which were later revised and officially published on October 18, 1968, in 33 Fed.Reg. 15478–80, to become effective December 2, 1968. The regulations would have forbidden government agencies *and their contractors* from purchasing their major requirements of helium from any source other than the Secretary, or private companies "eligible" under the regulations.

In Air Reduction Company v. Hickel, supra, these regulations were stricken down. The Court held that, although Congress had intended that the Secretary not lose his market because of private competition, it had not provided statutory authority to require government contractors to purchase their helium from the Secretary. The Court noted, however, that the Secretary's purpose could be accomplished by obtaining an Executive Order requiring that such provisions be included in all contracts entered into by government agencies. Air Reduction Company v. Hickel, supra, 420 F.2d at p. 597. An Executive Order was never obtained.

It became increasingly evident that the costs of the program were not diminishing according to expectations and that the program was being adversely affected by the intrusion into what had been a virtually exclusive government market of private producers of helium. Moreover, the program was suffering financially from a temporary lull in sales occasioned principally by the large cuts in the space program. Consequently, the Department of Interior started nego-

tiations with the four helium conservation contractors in an attempt to modify the contracts in a way that would reduce the costs of the program to the Government and still fulfill the goals of the program.

Due to diminished sales, however, the Department of Interior had fallen into arrears in making payments to the four helium contractors. Partial payments were made for a while, but payments ceased entirely in November, 1969, notwithstanding the continuance of deliveries. At the close of the calendar year of 1970, the Government owed large sums to the helium contractors for delivered helium. Consequently, on December 24, 1970, one of the helium contractors, Northern Helex Company, brought an action in the Court of Claims against the United States for breach of contract. In Northern Helex Company v. United States, 455 F.2d 546 (Ct.Cl.1972), the Court of Claims held that the Government was liable for anticipatory breach of the contract, but the issue of damages is still pending.

On January 26, 1971, and while negotiations were still in progress with at least one of the remaining contractors, the Department of Interior advised plaintiffs that, pursuant to paragraph 12.1 of the contracts, the contracts would be terminated effective sixty days thereafter. Although specific language varied, each contract provided for termination as follows:

"12.1 Buyer [Federal Government] may, at its option, terminate this contract at any time if, (1) in the opinion of the Secretary of the Interior, the discovery of large new helium resources or a substantial diminution in helium requirements or any circumstance of similar nature should occur which would make the continued operation of Seller's plant and the continued purchase of helium-gas mixture extracted therein unnecessary to accomplish the purposes of the Act or any amendment thereto, or (2) a material circumstance of force majeure making it impracticable or impossible

for either Buyer or Seller to carry out its obligations under this contract which circumstance cannot be remedied with reasonable dispatch."

The President's Budget, issued on January 29, 1971, coincidentally, did not include a request for appropriations for the continued funding of the contracts.

On March 17, 1971, the plaintiffs filed the instant action against the defendants, and on March 26, 1971, this Court issued a preliminary injunction enjoining the termination of the contracts. Following the decision of the Tenth Circuit Court of Appeals in National Helium Corporation v. Morton, 455 F.2d 650 (10th Cir. 1971), affirming this Court's holding, the decision to terminate the contracts was remanded to the Secretary for reconsideration in light of the requirements of the National Environmental Policy Act, 42 U.S.C. § 4331 et seq.

A draft environmental impact statement was subsequently prepared by the Department of Interior, and its availability was officially announced in the Federal Register on May 23, 1972. A final environmental impact statement entitled "Termination of Helium Purchase Contracts—United States Department of Interior—Bureau of Mines" was issued on November 13, 1972. On February 2, 1973, the Secretary of Interior gave notice of termination to the plaintiffs, to become effective sixty days thereafter. Accompanying the notices was a statement prepared by the Secretary justifying the termination of the helium conservation program in terms of the termination clauses of each of the helium purchase contracts.

The Secretary's termination statement, which is based on the Department's final environmental statement and the comments received from the private contractors, recognizes that: (1) the direct result of the decision to terminate the contracts will be that the Government will forego the storage of an estimated 20 billion cubic feet of helium which will be "wasted" or "depleted" if the contractors do not continue to extract and store the helium, prior

to delivery of the natural gas to fuel markets; (2) natural gas—primarily fuel gas—is the only known source of helium other than the atmosphere, an environmentally and economically inferior source; (3) the currently proved "helium-rich" natural gas reserves (containing at least 0.3% helium) will probably be exhausted before the turn of the century; (4) it is unknown exactly how much, if any, "lean" helium-bearing natural gas will be available after the year 2000; (5) present studies predict large demands for helium for environmentally beneficial uses beginning around the turn of the century which *could* rapidly deplete the helium supply then in storage; and (6) assuming a lack of supply at a later time, future environmentally beneficial technological advancements *might* be precluded due to unacceptably adverse environmental effects of recovery from other sources.

In contrast to the above possibilities, the Secretary's statement notes that: (1) government demand for helium has decreased consistently since 1966, and is presently below the 1961 level; (2) present technological advancement enables recovery of helium from "lean" sources of helium-bearing natural gas *expected* to be available in large quantities in the future; (3) the Bureau of Mines estimates a total of 17 to 24 billion cubic feet of *probable* shut-in "helium-rich" reserves (i.e., found in natural gas fields not being exploited for present fuel purposes); (4) including the helium currently in storage, in shut-in government reserves, and expected to be recoverable from government-owned plants, total reserves approximate 44.5 billion cubic feet; (5) storage of recoverable helium at today's costs does not necessarily assure "low-cost" helium in the future; (6) the forecasted large demands for the future are "speculative" and of *questionable* reliability; (7) government agencies' estimates for future helium demands would not require removal of helium presently in storage "to meet essential government needs" until well into the next century; and (8) assuming the estimated total future demands were to materialize at the beginning of the next century, as predicted, the storage now of an additional 20 billion cubic feet of helium would merely delay, rather than foreclose, the necessity of obtaining helium from presently unknown or environmentally disadvantageous sources.

On the basis of the above *assumptions,* the Secretary determined that there had been a substantial diminution in helium requirements for essential government activities and that the termination was therefore authorized under Section 12.1 of the contracts, since the purposes of the Helium Act Amendments of 1960 had been satisfied, citing § 167m of the Act, 50 U.S.C.:

"It is the sense of the Congress that it is in the national interest to foster and encourage individual enterprise in the development and distribution of supplies of helium, and at the same time provide, within economic limits, through the administration of this chapter, a sustained supply of helium which, together with supplies available or expected to become available otherwise, will be sufficient to provide for essential Government activities."

In their amended complaints, the plaintiffs seek declaratory and injunctive relief setting aside the Secretary's decision to terminate the helium procurement contracts. In summary, the complaints allege that: (1) the Secretary's termination decision was not preceded by full compliance with the procedural and substantive requirements of the National Environmental Policy Act, 42 U.S.C. § 4331 et seq., and the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; (2) the Secretary's termination decision was not warranted by the terms of the contracts, constituting the helium conservation program, and was accordingly inconsistent with the purpose of the Helium Act Amendments of 1960, 50 U.S.C. § 167 et seq.; and (3) the Secretary's termination decision was other-

wise "arbitrary, capricious, an abuse of discretion, and not in accordance with law."

## JURISDICTION

The plaintiffs' amended complaints not only challenge agency compliance with NEPA, but also seek review of agency action under the Helium Act Amendments of 1960, 50 U.S.C. § 167 et seq. The plaintiffs contend that the Secretary is, in effect, terminating the entire helium program authorized by Congress, and that this Court should review his action under the Administrative Procedure Act as authorized by Congress in 50 U.S.C. § 167h(a) in order to determine whether such action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The defendants concede this Court's jurisdiction to review procedural compliance with NEPA, but contend that the Court lacks jurisdiction to review the Secretary's decision on any other basis. The defendants assert three bases for this contention.

First, the defendants contend that, assuming full agency compliance with NEPA, all other claims sound solely in contract; that since the amount in controversy exceeds the sum of $10,000, this Court lacks subject matter jurisdiction over such claims by virtue of 28 U.S.C. § 1346(a)(2); that the proper forum for the relief sought by the plaintiffs is the Court of Claims in an action brought under the Tucker Act, 28 U.S.C. § 1491; and that neither this Court nor the Court of Claims is authorized to grant equitable or declaratory relief under such contracts, as dictated by United States v. King, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969), and Richardson v. Morris, 409 U.S. 464, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973).

■ The Court does not quarrel with the basic proposition that it lacks jurisdiction to grant declaratory relief to private individuals or companies merely seeking to obtain specific performance of government contracts, but it categorically rejects such a characterization of this action. As is evident from only a cursory examination of the pleadings in this case, the plaintiffs are not suing for breach of government contracts and seeking damages or specific performance —they are requesting the Court to enjoin the improper termination of practically an entire helium conservation program created by Congress to prevent the unnecessary depletion of a vital natural resource.

Although the plaintiffs are admittedly motivated by private pecuniary considerations, which fact gives them standing to sue (Association of Data Processing Service Organization, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)), the plaintiffs are also seeking vindication of the public's interest in protection of a vital wasting natural resource and the propagation of an important Congressional program. Viewing the plaintiffs' cause of action in this perspective, the Court will not permit the Secretary to shield his actions from judicial scrutiny and relegate the "public interest" to an impotent Court of Claims remedy "merely because it sounds in contract." National Helium Corporation v. Morton, 455 F.2d 650, 654 (10th Cir. 1971).

Second, the defendants contend that this is not an action solely against a government official, but is rather a suit against the United States, since the relief sought would expend itself upon the public treasury and preclude authorized government action, and that it is accordingly barred by the doctrine of sovereign immunity in accordance with Wells v. Roper, 246 U.S. 335, 38 S.Ct. 317, 62 L.Ed. 755 (1918); Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); Larson v. Domestic & Foreign Commerce Corporation, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); and Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). Although impliedly admitting that the Secretary's action in this case was "agency action" under the terms of the Administrative

Procedure Act, 5 U.S.C. §§ 551(13) and 701(b)(2), the defendants assert that that Act does not act as a waiver of sovereign immunity.

It must be recognized at the outset that the plethora of cases dealing with the nebulous and sometimes oppressive concept of sovereign immunity cannot be completely reconciled. As Mr. Justice Stewart noted in Malone v. Bowdoin, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962):

> "While it is possible to differentiate many of these cases upon their individual facts, it is fair to say that to reconcile completely all the decisions of the Court in this field prior to 1949 would be a Procrustean task." 369 U.S. at 646, 82 S.Ct. at 983.

Since the Court is convinced that this action is clearly not barred by the doctrine of sovereign immunity, it will waive embarkment. See Littell v. Morton, 445 F.2d 1207 (4th Cir. 1971).

■■ The defendants are correct in their assertion that the Administrative Procedure Act does not act as a waiver of sovereign immunity, *in and of itself.* Motah v. United States, 402 F.2d 1 (10th Cir. 1968), *contra* Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D. C. 371, 424 F.2d 859, 874 (1970). Here, however, Congress itself implicitly waived sovereign immunity as a bar to review of "agency action" under the Helium Act Amendments of 1960. Section 167h specifically provides that:

> " . . . provisions of the Administrative Procedure Act of June 11, 1946, as amended, shall apply to *any agency proceeding and any agency action taken under this chapter* . . . and the terms 'agency proceeding' and 'agency action' shall have the meaning specified in the Administrative Procedure Act." (Emphasis added.)

It would indeed be anomalous for this Court to hold that sovereign immunity barred review of action specifically made subject to review by the sovereign, simply because such review might eventually expend itself upon the public treasury. Since the Secretary's action of terminating the helium procurement contracts was clearly "agency action," the doctrine of sovereign immunity is accordingly inapplicable.

Finally, the defendants contend that even if the doctrine of sovereign immunity is not applicable to the plaintiffs' non-NEPA claims, the Secretary's action of terminating the helium procurement contracts is not subject to review under the Administrative Procedure Act, since it is agency action "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). There is simply no question but that the Secretary's action is action of an "authority of the Government of the United States," and that review is not prohibited by the Helium Act Amendments. 50 U.S.C. § 167h.

■ As noted by the Supreme Court in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the exception to the general rule that all agency actions are subject to judicial review, *unless* "committed to agency discretion by law," is a very narrow one. Referring to the legislative history of the Administrative Procedure Act, the Court noted that the exception is applicable only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945):

> "The statutes of Congress are not merely advisory when they relate to administrative agencies, any more than in other cases. To preclude judicial review under this bill a statute, if not specific in withholding such review, must upon its face give clear and convincing evidence of an intent to withhold it. The mere failure to provide specially by statute for judicial review is certainly no evidence of intent to withhold review." H.R.Rep.No. 1980, 79th Cong., 2d Sess., 41 (1945).

[6, 7] In determining whether in a particular case agency action is "committed to agency discretion by law,"

there is no presumption against review and in favor of administrative absolutism absent "a clear and convincing" showing of a contrary legislative intent or unless such purpose is fairly discernible in the statutory scheme. Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1510–1511, 18 L.Ed. 2d 681 (1967). The inquiry is not limited to merely whether the agency was given discretion to act, but also whether: (1) Congress intended that the exercise of that discretion be left *solely* to the expertise of the agency; and (2) the exercise of that discretion in a particular case involves the resolution of matters within the special administrative competence of the agency. Barlow v. Collins, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970). The Court cannot indulge in broad generalizations, but rather must review each individual agency action complained of in the light of the specific statutory scheme provided by Congress.

■ An examination of the legislative scheme provided by Congress in the Helium Act Amendments of 1960 reveals that the Secretary was given broad discretion in choosing an appropriate method of implementing a national helium conservation program. In the exercise of that discretion, the Secretary chose to enter into long-term contracts with the plaintiffs, and within those contracts he provided a method by which they could be terminated in the event that further helium procurement was unnecessary to accomplish the purposes of the Act. On February 2, 1973, the Secretary again, exercised his discretion when he determined that the continuation of the contracts was unnecessary, *since the purposes of the Helium Act had been satisfied.* That determination was necessarily predicated on the Secretary's interpretation of the intended scope and purposes of the helium conservation program as envisioned by Congress in the promulgation of the Helium Act, and in particular Section 167m, 50 U.S.C.

Implicit in the Secretary's determination to terminate these contracts was the Secretary's realization that, although he was given wide discretion in choosing the means of implementing the Helium Act, his actions were to conform to the overall objectives of the Act; that he was not given unfettered discretion to, in effect, change the underlying purpose of the Act itself. The plaintiffs contend that the Secretary's determination that the objective of the Act was to conserve helium for foreseeable and "essential government activities" was clearly erroneous and constituted an abuse of discretion. They do not request the Court to substitute its judgment for that of the Secretary in areas clearly intended to be left solely to his special administrative expertise, but they do assert that the Court is obliged to review the Secretary's decision insofar as it involves an interpretation of the underlying statute. The Court agrees.

The principal dispute in this case, beyond the agency's compliance with NEPA, clearly involves the Secretary's interpretation of the provisions of the Helium Act. Section 4332(1) directs that "to the fullest extent possible . . . [the] public laws of the United States shall be interpreted and administered in accordance with the policies" therein set forth. If in determining to terminate the helium procurement contracts the Secretary interpreted the objectives of the Helium Act in an erroneous or unnecessarily restrictive manner, his action would be contrary to not only the Helium Act, but NEPA as well; the statutes themselves clearly provide "law to apply." This statutory dispute must ultimately be resolved, not on the basis of matters within the special competence of the Secretary, but by judicial application of canons of statutory construction. Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). As Justice Harlan so aptly noted in his dissent in Hardin v. Kentucky Utilities Co., 390 U.S. 1, 14, 88 S.Ct. 651, 658–659, 19 L.Ed.2d 787 (1968):

"The role of the courts should, in particular, be viewed hospitably where . . . the question sought to be re-

viewed does not significantly engage the agency's expertise . . . 'where the only or principal dispute relates to the meaning of the statutory term' . . . [the controversy] presents issues on which courts, and not [administrators], are relatively more expert."

In light of the nature of the specific agency action involved in this suit and the clear congressional intention to permit review of agency action taken pursuant to the Helium Act Amendment of 1960 (50 U.S.C. § 167h(a)), this Court will not preclude review merely because the statute is written in broad and permissive language, although such fact necessarily limits the *scope* of the review. See Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969), and Mulloy v. United States, 398 U.S. 410, 90 S.Ct. 1766, 26 L.Ed.2d 362 (1970).

Although it is unnecessary to reach the Secretary's ultimate decision in this case, since compliance with NEPA is a necessary prerequisite to taking any major federal action and the Court is convinced that the Secretary did not comply with the procedural or substantive requirements of NEPA, the Court would advise the Secretary to carefully review the Helium Act *as a whole,* and especially in the light of its legislative history.

The Court has reviewed that history, and it has been unable to find any mention of limiting the scope of the program to satisfying only "essential government activities." On the contrary, the Chilson Report (which was the technical foundation underlying the legislative amendment), the remarks of Mr. Bennett[2] (Undersecretary of Interior who was the major agency representative encouraging passage of the Act), the repeated statements of Senator Allott[3] (the major sponsor of the Bill in the Senate), and the statements of those appearing before the Insular Committee, all repeatedly refer to the need to conserve the helium from being wasted "without serving any useful purpose." They all reflect deep concern that helium is wasting that might be needed at some future time for unforeseen needs of the entire nation. In the words of Senator Allott:

"The measure now awaiting final action by this body is, as we all must know by now, for the purpose of taking care of the reserves of helium for future use, both civilian and defense requirements. Although it is estimated that present reserves are adequate to meet forecast requirements for some time, these reserves are being depleted. . . . Mr. President, if we do not act promptly to halt this negligent, careless waste, we shall have little helium left for the future when, perhaps, we shall need it most." 106 Cong.Rec. 17855 (Aug. 26, 1960).

In reviewing the Helium Act itself, the only mention of any possible limitation on the conservation program which could even remotely be considered as limiting the purpose to conserving helium only for "essential government activities" is found in Section 15, 50 U.S.C. § 167m. The Court has reviewed that section in light of the overall purpose of the statute, and it would encourage the Secretary to do the same. It *appears* to the Court that the section was intended to insure that the federal government would not interfere with private production, development, and sale of helium *unless* such activity interfered with the Government's need to make its own program self-liquidating or to provide for "essential government activities," and that it was not intended as a limitation on the conservation program itself.

## SCOPE AND STANDARDS FOR REVIEW

Having resolved these preliminary jurisdictional issues, the Court will

2. See, Hearings on H.R. 8440, 8451, 10548, 11030 before the U.S. Senate Comm. on Interior and Insular Affairs, 86th Cong., 2d Sess. (1960).

3. See, 106 Cong.Rec. 17855, 18544–45, 18546, 18602 (1960).

now turn to the resolution of the plaintiffs' claims. As previously noted, the Court views the Secretary's compliance or non-compliance with NEPA to be the central issue of this case at this time. The plaintiffs assert that the procedural and substantive requirements of NEPA were not satisfied, and that the Secretary's termination of the helium procurement contracts must be enjoined and the matter remanded to the Department of Interior. The general rules regarding the scope and standards for review of agency action pursuant to the Administrative Procedure Act were only recently set out in detail by the Supreme Court in Citizens to Preserve Overton Park, Inc. v. Volpe, supra. In reviewing agency action, the Court is initially confronted with three questions: (1) what is the standard for review; (2) what is the scope of review; and (3) upon what evidentiary basis is the action to be judged.

 First, the standard for review to be applied in this case is readily apparent. Section 706 of the Administrative Procedure Act, 5 U.S.C., provides that in *all* cases a reviewing court must set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or which fails to meet statutory, procedural, or constitutional requirements. 5 U.S.C. § 706(2)(A), (B), (C), (D). Since the Secretary's action in this case was not taken pursuant to a rule-making provision of the Administrative Procedure Act or based on a public adjudicatory hearing, neither the "substantial evidence" nor *de novo* review standards are applicable.

 Second, the scope of review of agency action under the Administrative Procedure Act was clearly expressed by the Supreme Court in Citizens to Preserve Overton Park v. Volpe, supra, wherein the Court noted:

"Even though there is no *de novo* review . . . the generally applicable standards of § 706 require the reviewing court to engage in a substan-tial inquiry. Certainly, the Secretary's decision is entitled to a presumption of regularity, . . . but that presumption is not to shield his action from a thorough, probing, indepth review."

91 S.Ct. at 823–824.

Although this Court does not have the authority to substitute its judgment for that of the Secretary in areas of administrative expertise, it clearly does have the authority and obligation to engage in a careful scrutiny of the agency's action to determine whether such action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." This careful review is especially appropriate in a case such as this involving alleged non-compliance with the procedural and substantive requirements of NEPA. See Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); Scenic Hudson Preservation Conference v. Federal Power Commission, 453 F.2d 463 (2d Cir. 1971), cert. denied 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972); Environmental Defense Fund v. Corps of Engineers, 470 F.2d 289 (8th Cir. 1972); and Natural Resources Defense Council v. Morton, 458 F.2d 827 (D.C. Cir.1972).

Finally, a more difficult problem arises when determining upon what evidentiary basis an agency's action is to be judged in reviewing its propriety. Section 706 of the Administrative Procedure Act provides that "in making the . . . determinations, the court shall review the *whole record*." The defendants have persistently maintained that the administrative record in this case consists solely of: (1) the information relied upon by the Secretary in reaching his decision; (2) the comments received from agencies and interested parties responding to the draft environmental impact statement; and (3) the information brought to the attention of the agencies by the plaintiffs. The Court categorically rejects that position.

.

The National Environmental Policy Act places a positive duty on federal agencies to prepare a comprehensive environmental impact statement prior to taking any major federal action (§ 4332). Prior to the preparation of the statement, the Act directs that the agency *shall* "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to *any* environmental impact involved," and "initiate and utilize ecological information in the planning and development of resource-oriented projects" (§ 4332(C) and (G) ). In this case the plaintiffs have proffered numerous documents and reports which were either prepared by the Department of Interior itself or other federal agencies, or readily available to any member of the public bearing directly upon the environmental impact of the Secretary's action. The defendants' pat response is that the documents were not brought to their attention by the plaintiffs prior to the preparation of the final environmental statement or the Secretary's decision so they are not relevant. The fallacy inherent in this reasoning is that it assumes that it is the burden of others outside the agency to bring pertinent material to the attention of the agency —*it is not*. The duty to unearth and utilize all relevant and available information lies directly and unequivocally with the agency.

In reviewing agency compliance with NEPA, the Court is obliged to consider *all* relevant material bearing directly or indirectly on the environmental aspects of the action under consideration which were either (1) in the agency's files, but not disclosed in the final environmental statement; or (2) readily available to the agency had it fulfilled its statutory responsibilities. Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, supra, 449 F.2d at p. 1119.

After having reviewed the administrative record submitted to the Court by the Department of Interior, and as supplemented by the plaintiffs, the Court is convinced that the Secretary's attempted compliance with NEPA, which is a necessary condition precedent to any major federal action, falls woefully short of the Act's requirements in a number of significant respects, primarily, the shortcomings of the Department's final environmental impact statement. Consequently, the Court does not reach the plaintiffs' remaining claims, but rather, remands this matter to the Department of Interior for further consideration in light of this opinion.

## NEPA

In response to growing national concern about the state of the environment, Congress passed the National Environmental Policy Act (NEPA) in 1969. In so acting, Congress specifically recognized the need for a national policy which would encourage the productive and enjoyable harmony of man with his environment (§ 4321). Although the Act does not create any substantive rights to a clean and productive environment or establish environmental protection as the *exclusive* goal of federal agencies, it does assure that environmental amenities are carefully considered along with other considerations so that a proper balance is ultimately reached. Section 101, 42 U.S.C. § 4331, requires the federal government to use "all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources." Furthermore, in order to assure that the national policy is implemented and that all federal agencies plan and work toward meeting the challenge of a better environment, Congress specifically included certain "action-forcing" provisions. See S.Rep. No. 91–296, 91st Cong., 1st Sess. 9 (1969).

Section 102, 42 U.S.C. § 4332 provides, among other things, that each federal agency shall, "to the fullest extent possible," include in every recommendation or

report on major federal actions a "detailed statement" on:

"(C)

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

In addition, the section requires that "official shall consult with and obtain the comments of any Federal agency which has . . . special expertise with respect to the environmental impact involved," prior to the preparation of the statement (§ 4332(2)(C) ); that the agency "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources" (§ 4332(D) ); and that the agency "initiate and utilize ecological information in the planning and development of resource-oriented projects (§ 4332(G) ).

In furtherance of this congressional purpose, the Council on Environmental Quality has issued comprehensive guidelines for federal agencies to follow in conforming to the mandates of NEPA (36 Fed.Reg. 7724, 7727 (1971), Executive Orders have been issued directing federal agencies to develop procedures for implementing and enforcing the Act (Executive Order 11514, 35 Fed.Reg. 4247 (1970) ), and the Department of Interior has itself issued guidelines to be followed within its department in conforming with NEPA (36 Fed.Reg. 19,343–19,347 (1971) ).

 Based upon the clear language of NEPA, its implementing provisions, its legislative history, the many cases interpreting its import, and the underlying policy which it was intended to foster, it is clear that the mere formal filing of a document, in and of itself, does not satisfy the Act's substantive and procedural mandates or preclude further inquiry by judicial review. As noted in the recent Tenth Circuit Court of Appeals decision in Davis v. Morton, 469 F.2d 593 (1972):

"Reading the Act and its legislative history together, there is little doubt that Congress intended all agencies under their authority to follow the *substantive and procedural mandates of NEPA.*" 469 F.2d at 596. (Emphasis added.)

Compliance with NEPA is more than a mere ritual—it requires thorough research, investigation, corroboration, and consideration of the environmental effects attending a given agency action.

 In determining whether an agency has complied with NEPA prior to taking major federal action, the focal point of attention is the impact statement. As noted by Judge Leventhal in Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972), at page 833:

"Congress contemplated that the Impact Statement would constitute the environmental source material for the information of the Congress as well as the Executive, in connection with the making of relevant decisions, and would be available to enhance enlightenment of—and by—the public. The impact statement provides a basis for (a) evaluation of the benefits of the proposed project in light of its environmental risks, and (b) comparison of the net balance for the proposed project with the environmental risks presented by alternative courses of action."

Assuming that the agency has fulfilled its responsibilities by consulting with other agencies and utilizing available ecological and technical information, the statement should constitute a full-bodied

record upon which Congress, the Executive, the public and the agency can adequately judge the wisdom of the proposed action. Calvert Cliffs' Coordinating Committee v. Atomic Energy Commission, supra (purpose of statement is to aid agency in its decision and to fully inform other interested agencies and the public of environmental consequences); Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 749 (E.D. Ark.1971) (statement must alert President, Council on Environmental Quality, the public, and Congress to all known or possible environmental consequences); Ely v. Velde, 451 F.2d 1130, 1138 (4th Cir. 1971) (genuine, rather than perfunctory compliance with NEPA requires agency to explicate fully its course of inquiry, its analysis, and its reasoning); Greene County v. Federal Power Commission, 455 F.2d 412 (2d Cir. 1972), cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972) (statement must present a single coherent and comprehensive environmental analysis).

Before turning to the final environmental impact statement compiled by the Department of Interior in this case, it is first instructive to note that this is not the run-of-the-mill NEPA case. Normally, a federal agency is proposing to take affirmative action—such as the building of a dam, nuclear power facility, or pipeline—which is likely to have certain adverse environmental effects, yet which will also benefit society in some appreciable manner. The courts are consequently involved in the acrimonious imbroglio of assuring that the agency has adequately weighed the possible adverse environmental effects against the likely beneficial goals of the action, and that a thorough cost-benefit analysis has, in fact, preceded the action.

In this case, however, the Department of Interior is not proposing to take any affirmative action—rather, the Department is recommending the abandonment of a comprehensive conservation program authorized by Congress to save a vital natural resource which was being needlessly frittered away without first serving any useful purpose. It is clear beyond peradventure that the recommended action will not benefit society, except perhaps economically, and then only temporarily. The question is—will it injure society?

The Department of Interior has consistently maintained from the beginning of this litigation nearly two years ago that the Secretary's action does not constitute major federal action—that it merely involves the termination of three contracts. An examination of the final environmental impact statement prepared by the Department of Interior in this case demonstrates that the Department of Interior continues to harbor that crabbed conception of this action.

### THE IMPACT STATEMENT

On November 13, 1972, the Department of Interior issued a document entitled "Final Environmental Statement —Termination of Helium Purchase Contracts—United States Department of Interior—Bureau of Mines." The statement is comprised of eighty pages, excluding the comments received from other federal agencies and interested parties. It contains: (1) a general description of the proposed action (4 pages); (2) a general description of the environment (43 pages) including: the characteristics of helium (1 page); its current (9 pages) and prospective future uses (11 pages); its current proved, provable, possible, and speculative supply (11 pages); and its present and future demand to the year 2000 (9 pages); (3) a discussion of the environmental impact of the proposed action (11 pages); (4) a one-paragraph discussion of the possible unavoidable adverse environmental effects; (5) a two-paragraph discussion of the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; (6) a one-paragraph discussion of the irreversible and irretrievable commitment of resources involved in the termination; (7) a discussion of the alternatives to the proposed

action (6 paragraphs); and (8) a description of the consultation which preceded the issuance of the statement, and a reply to the comments received.

The Department's final impact statement is far from a coherent and comprehensive environmental analysis. It consists primarily of a narrative description of helium's characteristics and present and future uses, supply, and demand. After reviewing it, however, certain basic facts are evident: (1) these contracts involve the largest *known* source of helium-rich natural gas in the world, and if the helium is not extracted and stored it will be irretrievably lost; (2) present uses of helium indicate it is a most important or even indispensable element in our existing science, industry and ecology; (3) helium holds considerable promise as a necessary tool in the development of many environmentally beneficial technological advancements in such areas as exploration and future development of the sea, underground transmission of large blocks of electrical energy, virtually pollution free generation of energy, and efficient high speed ground mass-transportation systems; (4) of the proven sources of helium-rich natural gas, most will probably be totally depleted some time between 1985–2000; (5) if the expected technological breakthroughs, many of which are now in the experimental stage, come to pass, helium will either have to be recovered from low content helium-bearing natural gas or the atmosphere; and (6) if these contracts are terminated, the future availability of helium will be totally dependent upon the actions of the private companies.

After reviewing this portion of the statement, a number of questions beg answering: What is to be gained by terminating the contracts? Assuming that we will eventually have to rely on low content helium-bearing natural gas, how much is expected to be available at the turn of the century? Will recovery of helium from the atmosphere be economically feasible, and if so, will there be any adverse environmental effects?

What effect will a future shortage of helium have on the ability to go forward with research in the areas holding considerable environmental promise? If these technological advancements are precluded due to a lack of helium and we are forced to rely upon more conventional systems, what will be the environmental effects? If the program is working as envisioned by Congress and is, or could be, self-liquidating, why terminate it? Would it be economically feasible to expand the program? Is there any economic incentive for the private companies to extract and store the helium? These and other questions go completely unanswered in the impact statement.

The entire discussion of the environmental impact of the proposed action can be quickly summarized as follows: (1) the Government will forego the purchase and storage of approximately 20 bcf of a non-renewable resource; (2) whether this helium is extracted and stored is completely up to the companies; (3) there will be no immediate direct environmental effects to either continuation or termination of the contracts, besides a possibility of some unemployment within the contractors' corporate structures; (4) in the event that large demands should materialize due to the development of new technological advancements, the storage now of 20 bcf of helium would only extend, rather than foreclose, the necessity of turning to other sources of helium; (5) alternatives include variations of the recommended action or further expansion of the conservation program; and (6) although further expansion of the program could provide for additional helium and extend the period when helium will have to be obtained from unknown or environmentally disadvantageous sources, legislation does not presently allow for expansion so it is not a pertinent alternative.

In examining the final environmental impact statement to determine whether it complied with the substantive and procedural requirements of NEPA, it was unnecessary for the Court to substi-

tute its judgment for that of the Secretary in matters within his special expertise. The statement is appallingly deficient in a number of respects *on its face.*

## A. DESCRIPTION OF THE ACTION

One of the most important aspects of any final environmental impact statement is the clarity with which it sets forth the exact purpose of the proposed action—why the action is being recommended and what is to be gained from it. Once the purpose of the action is clearly in focus the decision-maker, Congress, the Executive, and the public are in a position to balance the possible adverse environmental effects against the benefits to be gained from the action and reach a balanced and knowledgeable decision on its merits.

In its final environmental impact statement, the Department of Interior states that the purpose of the action is the termination of three helium procurement contracts. Since it is clear that the termination will likely result in the wastage of approximately 20 bcf of a non-renewable natural resource, is the reader to conclude that the purpose of the action is to commit the helium to waste for no apparent reason? Regardless of Interior's interpretation of the Helium Act as not *requiring* the purchase and storage of this helium, there is no doubt but that it clearly has the *authority* to so act. What then is the purpose of the action?

Although it cannot be gleaned from the statement itself, a perusal of the administrative record shows that the primary reasons for the action are: (1) the fact that the program is not as financially sound as it was expected to be; and (2) the desire to save approximately forty million dollars annually for helium purchases during the life of the helium procurement contracts. If one or both of these reasons motivated the recommended action, then the final environmental statement should so state. Otherwise, there is no method by which to balance the interests and determine the proper course of action.

In addition, the statement not only fails to set forth the purpose for the action, but it also blatantly misdescribes the actual effect of the proposed action. The decision to terminate these contracts represents more than merely a decision to forego the purchase and storage of 20 bcf of helium. It means the effective withdrawal from the farsighted federal commitment to helium conservation made by Congress over a decade ago. It represents a return to the same situation that prevailed before the contracts were entered into—the needless and useless wastage of a vital natural resource before it serves *any* useful purpose—and a decision to essentially turn our backs on the future generations of Americans who are likely to be acutely confronted with a bankruptcy of resources.

## B. SHORT-TERM USES OF MAN'S ENVIRONMENT.

Section 4332(2)(C)(iv) of NEPA requires that each environmental impact statement set forth "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity. . . ." The Council on Environmental Quality's Guidelines provide that "this in essence requires the agency to assess the action for cumulative and long-term effects from the perspective that each generation is trustee of the environment for succeeding generations."

In a feeble attempt to comply with this requirement the Department's statement merely notes that it will forego the purchase and storage of 20 bcf of helium, and that the extent to which this helium could thereafter be recovered is conjectural. Although the statement recognizes the possibility that future demand may outrun then available supplies, it merely notes that the storage of an additional 20 bcf of helium now would only extend the period when it would have to be obtained from unknown sources by 4–15 years. The De-

partment's conclusion—since present storage will not prevent recourse to other sources forever, there is no need to consider conservation—is a non sequitur.

From the information contained in the comments received by the Department of Interior and the administrative record, there is little doubt but that large supplies of helium will be needed in order to assure the eventual realization of many environmentally beneficial technological breakthroughs expected to blossom around the turn of the century. The statement totally fails to consider the possible effects of termination on the ability to go forward with research, development, and the eventual application of these techniques. As noted in the Court's previous orders, some of the more important areas include electrical power generation by helium-cooled fission reactors, nuclear fusion reactors, superconducting systems of generation and transmission of power, magnetohydrodynamics, and transportation by superconducting magnetic levitation systems.

Although the statement makes no attempt to quantify the importance of 20 bcf of helium in these areas, the comments do. The Atomic Energy Commission opined that 20 bcf of helium would be sufficient to supply the necessary inventory for all of the nation's high-temperature gas-cooled reactors built through the year 2010. Union Carbide expressed the opinion that 20 bcf of helium would only supply one-third of the needed inventory for these reactors. Clyde E. Taylor, of the Lawrence Radiation Laboratory, estimated that 20 bcf of helium would provide the inventory for all of the nuclear fusion reactors built within the next fifty years. It is unknown how much helium will be needed in the other areas previously mentioned. Apparently, the Department did not feel it was important enough to look into.

In his recent message on the energy crisis, President Nixon stated that "if present trends continue unchecked, we could face a genuine energy crisis." But he added:

"The crisis can and should be averted, for we have the capacity and the resources to meet our energy needs if only we take the proper steps—and take them now."

There is no question but that new technological breakthroughs in techniques involving the use of large amounts of helium hold the promise of solving at least some of our future energy needs. In his message, the President recommended the development of a "more comprehensive, integrated national energy policy to meet the emerging energy challenge." He noted that he had proposed a 35% increase in the funding of the nation's nuclear fusion research and development effort to accelerate experimental programs and to initiate preliminary reactor design studies, including the development of MHD. There is no doubt that the energy research effort stands high on the nation's list of priorities. In fact, the country is spending over fifty million dollars annually for research in cryogenics and superconductivity. Any action now to terminate these contracts must, therefore, thoroughly consider the possible effects which might ultimately ensue. The statement totally fails in that regard.

## C. POSSIBLE ADVERSE ENVIRONMENTAL EFFECTS

Due to the failure of the statement to adequately consider the possible effect of the termination of the contracts on the future development and application of the technological advancements mentioned above, the statement is obviously incomplete in this regard. Section 4332(2)(C) requires that each statement include a discussion of the environmental impact of the proposed action. The specific treatment given to this subject in the final statement is startling in its brevity and lack of depth. In one paragraph, the statement points out that termination of these contracts would have no direct effect on the physical environment; that the Government would mere-

ly forego the purchase and storage of an additional 20 bcf of helium; and that some unemployment might result. The section concludes with the statement that if it should become necessary or desirable to extract helium from the atmosphere:

"It has been estimated that the power requirements to produce one billion cubic feet would be 26,000 megawatts. The generation of this amount of power using coal for fuel would add about 670,000 pounds per hour of pollutants to the atmosphere and increase thermal pollution by 3.5 times $10^2$ Btu per day."

This scientific description of the effects of obtaining helium from the atmosphere was translated into understandable terms by the comments of Union Carbide Corporation. The 26,000 megawatts of power required to produce one billion cubic feet of helium is about one-tenth of the present United States power capacity. To obtain from the atmosphere the 20.7 billion cubic feet of helium which is proposed to be abandoned would require the equivalent of two years of the United States' total power output with the consequent inevitable air and thermal pollution:

"To illustrate the impact upon thermal pollution, applying [the] logic of supplying 3.8 billion cubic feet of helium in the year 2000, if the total heat produced from all of the required helium-from-air plants were cooled by the water from the Mississippi River, the river temperature would be raised approximately 10 degrees Fahrenheit. If, as another example, the heat were discharged to the air in atmospheric (wet type) cooling towers, over 40 million barrels of water would be evaporated each day. This is about 125% of New York City's average daily water consumption of 30 million barrels." (Contractors joint response to DES pp. 13–14.)

Although the Court cannot understand why the Department's final statement did not phrase the discussion of the environmental effects of obtaining helium from the atmosphere in more commonly understood terms, it does alert the reader to the problem.

The Court's major complaint regarding the Department's discussion of possible adverse environmental effects of the proposed action is, as previously alluded to, the failure to discuss *any* secondary and indirect environmental effects likely to arise in the future. The Council on Environmental Quality's Guidelines specifically state that "both primary and secondary significant consequences for the environment should be included in the analysis." 36 Fed.Reg. 7725 (April 23, 1971). It further provides that:

"The Act (NEPA) also indicates that adverse significant effects include those that degrade the quality of the environment, *curtail the range of beneficial uses of the environment, and serve short-term, to the disadvantage of long-term, environmental goals. . . .* Significant adverse effects on the quality of the human environment include both those that directly affect human beings and those that indirectly affect human beings through adverse effects on the environment." (Emphasis added.)

In analyzing the statement's discussion of adverse environmental effects, two questions immediately come to mind: (1) what effect will the possible inability to go forward with research and development in the areas previously specified, due to the lack of an adequate supply of helium, have upon the future standard of living for Americans and the beneficial range of choices at the turn of the century; and (2) what will be the environmental effects of the necessity to utilize more conventional means of producing and transmitting energy and transporting large numbers of citizens to and from our cities? Although the statement does not even attempt to answer either question, the latter is somewhat answered by the comments to the statement.

Union Carbide estimated that 3,000,000 mw of nuclear powered electric generators would have to be built between 1980 and 2010. Assuming that helium was not available to supply (i. e., cool) these reactors, it noted:

"The environmental impact of being forced to choose a less desirable reactor because of inability to obtain the required helium supply would be very large indeed. One thousand 1,200 mw electric stations using pressurized or boiling water reactors instead would increase waste heat rejection by 1,000,000 mw. This much waste heat is sufficient to heat the Niagara River enough to cook any fish or other living creatures and make Lake Ontario a dead sea. If this amount of waste heat were rejected in conventional cooling towers, it would vaporize over a million tons of water per hour, or the equivalent of one hundred acre ponds ten feet deep every day."

The response of the Pacific Gas and Electric Company concurred with Union Carbide's conclusion, noting that if it should later become necessary to rely upon steam-cooled reactors it could have a "staggering environmental impact." The statement does not even mention these possible adverse environmental effects. What additional adverse environmental effects are likely to result from the present termination of these contracts is not discussed. The Court is aware of the speculative nature of these future projections, but the future supply of helium is likewise speculative. Complete analysis demands further attention to this area.

### D. IRREVERSIBLE AND IRRETRIEVABLE COMMITMENTS

Section 4332(2)(C) of NEPA requires that each statement contain a discussion of "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." In discussing this aspect of the environmental impacts of the proposed action, the Department of Interior merely notes that if the helium is not extracted from the natural gas streams, it will escape to the atmosphere. It then states that:

"Upon termination of the helium purchase contracts, the extent to which each of the companies would continue to recover helium from the natural gas available to it and the extent to which it would store such helium . . . would rest entirely with each of the companies."

NEPA requires that federal agencies "use all practical means, consistent with other essential considerations of national policy, to improve and coordinate federal plans, functions, programs, and *resources*, to the end that the nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

. . . . . .

(5) achieve a balance between population and *resource* use which will permit high standards of living and a wide sharing of life's amenities; and

(b) enhance the quality of renewable resources and approach the *maximum attainable recycling of depletable resources*." § 4331(b). (Emphasis added.)

In addition to these requirements of NEPA, the Helium Act clearly places the responsibility for assuring that the helium conservation program is carried out in conformity with the Congressional objective squarely on the shoulders of the Secretary of Interior.

The Department of Interior cannot meet these responsibilities by merely recognizing that the future availability of helium will rest upon the companies' decisions. The impact statement should thoroughly examine what is likely to happen in the event that the contracts are terminated. Ever since the inception of the helium conservation program in 1960, the Government has operated on the assumption that current demands for helium, when coupled with the speculative nature of future helium demands,

made it highly improbable that private companies would bear the economic burden of storing the helium for future use. If this situation still prevails, and in light of the diminished current demand for helium it would appear that it does, then the statement should so admit. In that event, the inadequacies of the discussion of irreversible and irretrievable commitments of resources are self-evident. If, on the other hand, it is certain that the companies will continue to extract the helium, then such a discussion would be unwarranted. In either event, the statement should reveal the facts as they are so that the reader is not left hopelessly in the dark.

### E. ALTERNATIVES TO THE RECOMMENDED ACTION

Section 4332(2)(D) of NEPA requires each federal agency to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." In addition, Section 4332(2)(C)(iii) provides that the statement shall include a discussion of "alternatives to the proposed action." As noted by the Second Circuit Court of Appeals in Monroe County Conservation Council Inc. v. Volpe, 472 F.2d 693, 697–698 (2d Cir. 1972):

> "The requirement for a thorough study and a detailed description of alternatives, which was given further Congressional emphasis in § 4332(2)(D), is the linchpin of the entire impact statement."

Besides a short discussion of the alternatives available to the private companies if the contracts are terminated, the final environmental impact statement lists the following alternatives: (1) variations in the proposed action, such as termination of one or two of the contracts, which would only vary the action in degree; (2) continuation of the contracts coupled with extension of their terms and an expansion of the amount to be purchased, which would extend the period when helium would have to be re-

covered from other sources by 7–24 years; and (3) various alternative methods of obtaining additional helium from other sources. Insofar as the latter two alternatives are concerned, the statement notes that the Department presently lacks statutory authority to implement them.

Assuming the exact nature of and reasons for the proposed action had previously been stated, and the possible environmental effects of the action had been thoroughly explored, the discussion of alternatives to termination could rationally be judged. As previously noted, however, the statement at no time tells the reader why the contracts are being terminated. If future needs and future supplies of helium gas are speculative, as all parties admit, then an examination of the statement itself would lead the reader to believe that the reason was either: (1) to casually waste a vital natural resource for the monetary savings; or (2) to terminate the contracts because the amount of helium being conserved would only extend the time when helium would have to either be ignored as a natural resource or obtained from less environmentally advantageous sources, rather than preclude such occurrence. Obviously, this action is not motivated by either of these reasons, but what is the reason? The Department's discussion of alternatives epitomizes its attitude in this entire matter.

Decisions of this magnitude simply cannot be made in conference rooms behind closed doors. NEPA requires full disclosure of the exact nature of and reasons for a given action. It is only in this manner that an action can be judged on its merits and a reasoned choice between alternatives can be reached. When Congress passed the Helium Act in 1960, it provided a method by which the helium conservation program could be made self-liquidating—a method by which helium could be preserved for future generations at little or no cost to this generation. They realized that the loss of a natural resource before it served any useful purpose, in

and of itself, constituted a needless and unwarranted environmental impact.

There is no question but that the termination of these contracts involves "unresolved conflicts concerning alternative uses of available resources." It is also clear from an examination of the administrative record in this case that the reason for the termination of the helium procurement contracts is the failure of the conservation program to become fiscally self-sufficient. The obvious alternative to cancelling these contracts is to make the program self-sustaining, yet the impact statement does not even consider this aspect. The Court finds this omission fatal.

The many documents and reports found in the administrative record and the comments received in response to the issuance of the draft environmental statement list a number of financial and legislative alternatives which could make the program financially sound. They include: (1) negotiation with the contractors in an attempt to obtain a lower purchase price (a tentative agreement with National Helium Corporation would have reduced the Government's cost for helium-gas mixture by nearly 40%); (2) requiring all government contractors to purchase their helium requirements from the Department by Executive Order, as suggested in Air Reduction Company v. Hickel, 137 U.S.App.D.C. 24, 420 F.2d 592 (1969); (3) varying the sale price of the helium (Congress had originally recommended that the helium be sold for $40–$45, while the Department is presently selling it for $35); (4) placing a federal tax on the sale of helium not produced by the Government; (5) giving foreign governments a preferential right to purchase some of the helium and store it in the Cliffside facility; (6) lowering or eliminating the interest charge on borrowed money now used to operate the program; (7) treating the helium stored in Cliffside as a stockpile (materials and supplies now stockpiled such as copper, zinc, cobalt, and manganese, do not have interest added to current market price when sold,

as helium does); and (8) prepayment to the Government by public utility companies ordering nuclear power stations, i. e., high temperature helium gas-cooled reactors (HTGR) for a future supply of stored helium to insure operation during the life of the reactor (see Appendix to Response of Union Carbide Corporation to Environmental Statement). Are any of these alternatives feasible? Would they individually or in combination assure a self-liquidating program or even an expanded conservation program which would take care of the needs of future generations? The statement's discussion does not even mention these alternatives, let alone analyze them in relation to the overall goals of the conservation program, but merely leaves the matter to the imagination of the reader.

In addition to the failure of the statement to discuss alternatives to the termination of the contracts which could make the present program self-sustaining—alternatives recommended by many of the officials within the Department of Interior itself—the statement is wholly lacking in a meaningful discussion of alternatives which could at least minimize, if not avoid, the future necessity of either going without helium, and consequently the technological advancements expected to be derived from its availability, or obtaining it from sources posing serious environmental effects. Although the statement lists the possibility of expanding the program in order to obtain additional sources of helium, it at no time analyzes the feasibility of such expansion or the overall minimization of possible adverse environmental effects attending such expansion.

The Council on Environmental Quality's Guidelines provides that in any action involving unresolved conflicts concerning alternative uses of available resources the statement must engage in a rigorous evaluation of alternatives:

"A rigorous exploration and objective evaluation of alternative actions that might avoid *some or all* of the adverse environmental effects is essential. *Sufficient analysis of such alterna-*

*tives and their costs and impact on the environment should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might have less detrimental effects."*

36 Fed.Reg. 7725 (April 23, 1971) (Emphasis added.)

There is absolutely no question but that the proposed action of the Department of Interior poses serious possible adverse environmental effects, despite the failures of the statement to elucidate them, and that the future availability of helium poses unresolved conflicts. If the continuation of these contracts alone will only *extend* the period within which helium might be scarce, then a full discussion of alternative methods of minimizing the eventual scarcity is demanded. The statement's discussion of these alternatives is simply too vague, general, and conclusionary. See Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346 (8th Cir. 1972), and Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 834 (1972).

The Court is aware of the defendants' contention that a vigorous analysis of alternatives requiring changes in legislation is normally not required of agencies. If this case merely involved the termination of three contracts the Court would fully agree with the contention that a rigorous examination of alternatives beyond the Department's legislative authority would be unnecessary. The Court *does not* agree. As has been previously noted, the Court views the Department's proposed action in this case as, *in effect*, a decision that a comprehensive program authorized by Congress is either unworkable, unwarranted, or unnecessary. It is more than a decision to terminate these three contracts, it is a decision to totally abandon a farsighted concept of present conservation for future utilization, and it could very well have the effect of precluding future expansion of the program.

As Senator Jackson noted prior to the passage of NEPA:

"The needs and aspirations of future generations make it our duty to build a sound and operable foundation of national objectives for the management of our resources for our children and their children. The future of succeeding generations in this country is in our hands. It will be shaped by the choices we make. *We will not, and they cannot escape the consequences of our choices."*

115 Cong.Rec. S 17451 (Dec. 20, 1969) (Emphasis added.)

If we are to make the necessary choices today, we must first be fully aware of the available range of alternatives. The Congressional decision to implement the conservation program was preceded by a thorough analysis and consideration of the broad long-range effects attending the present wastage of helium and the available alternatives. A decision to terminate the program now must likewise be preceded by such an analysis—it simply has not been.

F. PROCEDURE

There are a number of unresolved conflicts involved in the Department's proposed termination of the helium procurement contracts. Some of the more outstanding ones are: (1) Will there be any appreciable natural gas available at the turn of the century to serve as a source for future helium demands? (2) What effect will a future helium shortage have on this country's growing inability to meet its energy needs? (3) What effect will the possible inadequacy of helium at the turn of the century have on the ability to go forward with the development of such promising technological advancements as nuclear fusion, undersea exploration and development, outerspace exploration, and mass transportation? (4) What effect will a helium shortage have on the development of similar technologies in other countries of the world that are not blessed with such plentiful supplies of helium as this country? Although NEPA does not require "crystal ball" accuracy or the discussion of remote or

speculative possibilities, it does require the agencies to take a "hard look" at the possible environmental impact of a given action and discuss reasonably foreseeable effects with a thoroughness commensurate with their severity and the significance of the action. The Court is convinced that the Department's attempted compliance with NEPA in this case falls far short of these responsibilities.

Section 4332(2)(C) of NEPA requires that before making the required detailed statement on environmental impact, the federal officials responsible for the statement "shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." The extent of consultation by the Department of Interior in this case is indicated at the end of the text of the statement. The Department merely sent copies of the draft environmental statement to the federal agencies and invited, within a forty-five day time structure, comments and estimates of future helium requirements. Although several agencies expressed the desirability of more time and further consultation, there apparently was none.

In 1970, Congress passed the National Materials Policy Act of 1970, 84 Stat. 1234, 42 U.S.C. § 3251 et seq. Section 202 of that statute states that it is the purpose of the Act:

"To enhance environmental quality and conserve materials by developing a national materials policy to utilize present resources and technology more efficiently, to anticipate the future materials, requirements of the Nation and the world, and to make recommendations on the supply, use, recovery, and disposal of materials."

In furtherance of this policy, the Act created a National Commission on Materials Policy to look into the nation's and the world's resources (including energy), make long-range predictions as to their availabilities, and provide recommendations in such broad areas as maximization of resource use; conservation and environmental protection; preferred technologies and research priorities; waste management and recycling; the use of incentive, penalties, and other control techniques; public education and the reshaping of values. On June 30, 1973, the Commission is due to submit their report to the White House and Congress. Although the work of the Commission is obviously related to the proposed termination, and despite the suggestion of the Environmental Protection Agency that the Secretary confer with it, the Department did not even send them a copy of the draft statement.

Section 4332(2)(G) of NEPA, requires that agencies "initiate and utilize ecological information in the planning and development of resource-oriented projects." The National Science Foundation advised the Department of Interior that it ws considering funding a "detailed study of helium needs and reserves through our Research Applied to National Needs Program." Such a study is, in fact, in progress at this time. The Department was urged to participate in the study, but it declined, due to the pending litigation.

In response to the plaintiffs' contention that the Department's failure to either consult with or actively participate in these comprehensive studies constitutes a clear violation of the requirements of NEPA, the defendants reply that either: (1) they were not brought to their attention by the plaintiffs, an observation of dubious validity; or (2) the Department's participation in such studies might have jeopardized their status in pending litigation. A response to this reasoning is unnecessary.

### PUBLIC HEARINGS

Due to the failure of the Department of Interior to comply with either the procedural or substantive requirements of NEPA, the Court is remanding this matter to the Department for further consideration in light of this opinion. The plaintiffs have asserted that upon remand the Department should be ordered to hold public hearings, due to the

large number of unresolved conflicts inherent in the proposed action. The great majority of the scientists, industry officials, and Congressmen responding to the Department's final environmental impact statement also requested public hearings. The response of the Department of Interior to such requests was:

"It is felt that the material accumulated in the draft environmental impact statement and the responses thereto is more than adequate for the purposes of preparing a final environmental statement and of informing the public, and that hearings would not develop new material of a substantive nature which would materially aid in meeting these objectives. Therefore, public hearings were not scheduled."

As noted by the Tenth Circuit Court of Appeals in affirming this Court's order granting a preliminary hearing in this case, "neither the APA nor the NEPA compels [the Secretary] to appoint an examiner and conduct hearings." National Helium Corporation v. Morton, 455 F.2d 650, 657 (10th Cir. 1971). The Council on Environmental Quality's Guidelines (36 Fed.Reg. 7724–7725), the Executive Order implementing NEPA (Executive Order 11514, 35 Fed. Reg. 4247), and the Department's own guidelines (36 Fed.Reg. 18343, 19346, October 2, 1971), do, however, provide that public hearings shall be held "whenever appropriate." It is clear, therefore, that the Department's failure to hold public hearings was not contrary to law. The question is—was it an abuse of discretion? See Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1285–1286 (9th Cir. 1973).

▮ In light of the large number of unresolved issues extant in this case, the deep public concern expressed by those responding to the Department's draft statement, the need for public enlightenment in areas involving the future availability of natural resources such as this, and the overriding national policy issue involved in this proposed action, the Court is convinced that the Department's failure to hold public hearings did constitute an abuse of discretion. The Court simply cannot envision a more "appropriate" case. Although the Court does not agree with the plaintiffs' contention that such hearings must necessarily be adversary in nature, the Court does believe that some type of formal hearings would materially advance the public interest and improve the overall quality of the Department's statement. The resulting final environmental statement would then serve as an instructive base for national action, administrative or legislative, or both.

## ORDER

This Court has already ruled that the proposed action of the Department of Interior threatens irreparable injury to the plaintiffs and the public interest. A preliminary injunction is now in effect. For the reasons herein stated, the Court finds that the Secretary of Interior has not complied with either the procedural or substantive requirements of NEPA. Since compliance with NEPA is a necessary condition precedent to taking any major federal action, the Court does not reach the propriety of the Secretary's actual decision to terminate these contracts. To reiterate, the purpose for requiring strict compliance with NEPA is to assure that the decision-maker does, in fact, take a "hard look" at possible environmental impacts of a given action, balance those impacts against the benefits to be derived from the action, and reach an ultimate decision which gives fair consideration to environmental amenities. Due to the many inadequacies of the final environmental impact statement prepared by the Department of Interior, and before the Secretary when he made his final decision, such balancing process simply could not have occurred. Assuming that the Secretary had been fully apprised of the environmental impacts involved in the termination of these contracts, his decision might have been different. This matter

must, therefore, be remanded to the Department of Interior for further consideration in light of this opinion.

It is therefore ordered that the preliminary injunction issued by this Court on March 27, 1971, enjoining the defendants, their agents and employees, from taking any action leading to the final termination of the National Helium Program and the implementing Contracts No. 14–09–0060–2429, No. 14–09–0060–2434, and No. 14–09–0060–2424, be, and the same hereby is, continued in full force and effect pending further order this Court.

It is further ordered that the bond previously set as payment of such costs and damages as may be incurred by defendants if they are found to have been wrongfully restrained, shall continue in full force and effect pending further order of this Court.